# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

WILLIAM and MAUREEN ANELLO,    )
    )
        Plaintiffs,    )
    )
        v.    )    C.A. No. 07-668 LPS
    )
INDIAN RIVER SCHOOL DISTRICT    )
and SUSAN S. BUNTING,    )
    )
        Defendants.    )

## DEFENDANTS' OPENING BRIEF IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

David H. Williams (#616)
dwilliams@morrisjames.com
James H. McMackin, III (#4284)
jmcmackin@morrisjames.com
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899
(302) 888-6900/5849
Attorneys for Defendants

Dated: August 20, 2008

## TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ........................................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS ............................................. 2

SUMMARY OF ARGUMENT ......................................................................... 5

RELEVANT FINDINGS OF FACT MADE BY THE PANEL ............................ 6

ARGUMENT ................................................................................................ 15

    I.    GIVEN THE EXPERTISE OF A SPECIAL EDUCATION PANEL,
        ITS DEMONSTRATED KNOWLEDGE OF THE EVIDENCE, AND
        ITS CORRECT APPLICATION OF THE LAW TO THE FACTS,
        THE COURT SHOULD AFFORD CONSIDERABLE WEIGHT TO
        THE PANEL'S FINDINGS ........................................................ 15

    II.   THE RECORD OVERWHELMINGLY SUPPORTS THE PANEL'S
        CONCLUSION THAT THE DISTRICT FULFILLED ITS CHILD
        FIND OBLIGATION .................................................................. 18

    III.  THE CHILD FIND CLAIM IS MOOT BECAUSE G.A.'S
        PROGRAMMING AND SERVICES WOULD NOT HAVE BEEN
        SIGNIFICANTLY DIFFERENT THAN WHAT THE DISTRICT
        PROVIDED HAD SHE BEEN IDENTIFIED AS ELIGIBLE TO
        RECEIVE SERVICES UNDER THE IDEA SOONER ...................... 25

    IV.  G.A.'S IEP WAS REASONABLY CALCULATED TO PROVIDE
        MEANINGFUL EDUCATIONAL BENEFIT AS THE PANEL
        DETERMINED AND THE OVERWHELMING EVIDENCE
        DEMONSTRATES ..................................................................... 26

    V.   BECAUSE THE IEP AND PLACEMENT WERE APPROPRIATE,
        THE PARENTS ARE NOT ENTITLED TO TUITION
        REIMBURSEMENT OR THE COSTS OF UNILATERAL PRIVATE
        PLACEMENT ........................................................................... 31

    VI.  THE UNREASONABLENESS OF PARENTS' CONDUCT IN THIS
        CASE WARRANTS A DENIAL OF RELIEF ............................... 32

VII.    DR. BUNTING MUST BE DISMISSED AS A DEFENDANT
BECAUSE SHE WAS NOT YET HIRED BY THE DISTRICT AS
THE SUPERINTENDENT WHEN G.A. WAS ENROLLED IN
THE DISTRICT ............................................................................ 35

VIII.   THE PANEL MADE NO ADVERSE EVIDENTIARY RULINGS
RELEVANT TO PARENTS' CASE WHICH IMPLICATE FEDERAL
RULES OF EVIDENCE 401 OR 702 ............................................ 36

IX.    GIVEN THE COMPLETE FAILURE OF THE IDEA CLAIMS, THE
CLAIMS UNDER SECTION 504 CANNOT BE SUSTAINED ................. 37

X.     NO RELIEF IS DUE BECAUSE THERE WAS NO DEPRIVATION
OF FAPE .................................................................................. 37

XI.    ATTORNEYS FEES ARE NOT AVAILABLE BECAUSE PARENTS
DID NOT HAVE AN ATTORNEY .................................................... 39

XII.   THE CLAIMS UNDER 42 U.S.C.A. § 1983 MUST BE DISMISSED
BECAUSE VIOLATIONS OF SECTION 504 AND THE IDEA
CANNOT GIVE RISE TO A CAUSE OF ACTION UNDER
SECTION 1983 ............................................................................ 39

CONCLUSION .............................................................................................. 40

# TABLE OF AUTHORITIES

**PAGE**

<u>Cases</u>

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986)............................................................... 15

*A.W. v. Jersey City Pub. Sch.*,
  486 F.3d 791 (3d Cir. 2007)................................................. 39

*Beale v. Hardy*,
  769 F.2d 213 (4th Cir. 1985) .............................................. 15

*Bernardsville Bd. of Educ. v. J.H.*,
  42 F.3d 149 (3d Cir. 1994).................................................. 16

*Board of Education of Hendrick Hudson Central School District v. Rowley*,
  458 U.S. 176 (1982)................................................. 16, 17, 27

*Carlisle Area Sch. V. Scott P.*,
  62 F.3d 520 (3d Cir. 1995).......................................... 17, 27, 38

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)............................................................. 15

*Coale v. State Dept. of Educ.*,
  162 F. Supp.2d 316 (D. Del. 2001)........................ 17, 18, 27, 28

*Doe v. Board of Education of Tullahoma City Schools*,
  9 F.3d 455 (6th Cir. 1993) ................................................. 28

*F.D. ex rel. K.D. v. Holland Twp. Bd. of Educ.*,
  2006 WL 2482574 (D.N.J., Aug. 25, 2006) ....................... 36

*Florence County Sch. Dist. Four v. Carter*,
  501 U.S. 7 (1993)........................................................ 17, 31

*Fuhrmann v. East Hanover Bd. of Educ.*,
  993 F.2d 1031 (3d Cir. 1993).......................................... 16, 28

*M.C. v. Central Reg'l Sch. Dist.*,
  81 F.3d 389 (3d Cir. 1996).......................................... 37, 38

*Murray v. Montrose County Sch. Dist.*,
    51 F.3d 921 (10th Cir. 1995) ........................................................................ 17

*Oberti v. Bd. of Educ.*,
    995 F.2d 1204 (3d. Cir. 1993) ......................................................... 16, 17, 32

*Polk v. Cent. Susquehanna Intermediate Unit*,
    853 F.2d 171 (3d Cir. 1988) ........................................................................ 27

*Ridgewood Bd. of Educ. v. N.E.*,
    172 F.3d 238 (3d Cir. 1999) ......................................................... 17, 27, 31, 37

*Robertson County Sch. Sys. v. King*,
    99 F.3d 1139 (6th Cir. 1996) ...................................................................... 18

*Schaffer v. Weast*,
    546 U.S. 49 (2005) ................................................................................ 17, 28

*Steinberg v. Weast*,
    132 F. Supp.2d 343 (D. Md. 2001) ............................................................ 28

*Susan N. v. Wilson Sch. Dist.*,
    70 F.3d 751 (3d Cir. 1995) ........................................................... 15, 16, 28

*Town of Burlington v. Dept. of Educ.*,
    736 F.2d 773 (1st Cir. 1984)
    *aff'd on other grounds,* 417 U.S. 359 (1985) ........................................ 16, 31, 37

## Statutes and Other Authorities

AMSES  § 4.81 – 4.83 ............................................................... 12, 19, 21, 24

34 C.F.R. § 300.7(c)(10) ............................................................................ 18

34 C.F.R. § 300.346(a)(1) .......................................................................... 29

34 C.F.R. § 300.403(d) .............................................................................. 32

34 C.F.R. § 300.534 .................................................................................. 23

14 *Del. C.* § 3135 ...................................................................................... 2

20 U.S.C.A. § 1400 *et seq.* ........................................................................ 3

20 U.S.C.A. § 1412(a)(10)(C)(iii) .............................................................. 32

20 U.S.C.A. § 1414(i)(2)(B) ................................................................... 15

20 U.S.C.A. § 1414(a)(2)(B)(i) ............................................................... 20

20 U.S.C.A. § 1415 .................................................................................. 16

20 U.S.C.A. § 1415(f) ................................................................................ 2

20 U.S.C.A. § 1415(i)(2)(A) ................................................................ 1, 4

20 U.S.C.A. § 1415(i)(2)(C) ................................................................... 15

42 U.S.C.A. § 1983 .............................................................................. 5, 39

Fed. R. Civ. P. 56(c) ............................................................................... 15

Federal Rule of Evidence 401 ............................................................... 36

Federal Rule of Evidence 702 ............................................................... 36

# INTRODUCTION

This case involves an appeal from a special education panel (the "Panel") appointed by the Delaware Department of Education pursuant to 20 U.S.C.A. § 1415(i)(2)(A). The parents ("Parents")[1] allege the Indian River School District (the "District") failed to timely identify their daughter, G.A.,[2] as eligible to receive special education services under the Individuals with Disabilities Education Act ("IDEA"). The District bears the burden of showing it did not unreasonably delay in determining if G.A. was eligible to receive special education services. The Parents also allege the District failed to provide G.A. with an appropriate Individual Education Plan ("IEP"). The Parents bear the burden of showing that the IEP was not appropriate. Over multiple days of hearings, the Panel received copious testimony demonstrating that the District acted diligently and reasonably, and thus determined there was <u>no evidence</u> that the District unreasonably delayed in determining whether G.A. was eligible to receive special education services.[3] The Panel also found that the IEP proposed by the District was reasonably calculated to provide meaningful educational benefit and denied the requested relief.

Under the standard of review, the District Court must afford "due weight" to the Panel's determination. As all of the evidence supports the Panel's determination, and there was no error of law, the decision of the Panel must be affirmed.

---

[1] Unless the context requires otherwise, "Parents" refers to both of the parents.
[2] "G.A." is used to protect the anonymity of the student.
[3] As set forth on page 4, *infra*, the Panel found a short temporal gap when G.A. should have been evaluated sooner, but this issue is moot because the Parents provided no evidence of expenditures as ordered.

1823386/1

## NATURE AND STAGE OF THE PROCEEDINGS

In 2004, the Parents filed a request for a due process hearing with the Delaware Department of Education on behalf of G.A. As the IDEA requires, the Parents asserted their claim before an administrative special education due process panel. 20 U.S.C.A. § 1415(f); 14 *Del. C.* § 3135. They filed the hearing request with the Department of Education on or about August 31, 2004. The Parents sought (1) reimbursement for Occupational Therapy ("OT") expenses, (2) reimbursement for private tutor costs, (3) reimbursement of Sylvan Reading costs, (4) tuition reimbursement, and (5) ongoing OT services. (DE-8-1).[4] In 2005, the Panel issued a decision in favor of the District on all issues.

Parents appealed to the Family Court of Sussex County. On appeal, the Parents contended the Panel committed reversible error by prohibiting them from presenting evidence on the issue of whether the District failed to timely identify G.A. as a child with a disability in need of special education under the IDEA (the "Child Find" claim). They also contended the Panel erred in finding their unilateral decision to remove G.A. from the District and place her in a private school effectively precluded their claim that the District failed to provide G.A. with an appropriate IEP. The Family Court of Sussex County issued its decision on January 19, 2007 affirming in part and remanding in part the Panel's decision. The Family Court found the request for a due process hearing met the minimal pleading standard to inform the District and the Panel of the Child Find claim. Therefore, the Court found error in the Panel's decision to not hear evidence on the Child Find claim. Second, the Court found that, even though the Panel heard five days of testimony focused almost entirely on the appropriateness of the IEP, the Panel

---

[4] All 2005 School District/Parents Exhibits will be cited herein as "PE/DE – tab number – exhibit number."

1823386/1

incorrectly focused their decision that the IEP was appropriate on the fact that the Parents unilaterally withdrew G.A. from the District without giving the District an opportunity to implement the IEP.

On remand, the Family Court directed the Panel to decide two central issues. First, whether the District failed to timely identify G.A. as a child with a disability in need of special education under the IDEA, 20 U.S.C.A. § 1400 *et seq.* and Chapter 31 of Title 14 of the Delaware Code. Second, whether the proposed IEP for the 2004-2005 school year was inappropriate.

At the first hearing, the Panel heard no evidence on the issue of whether the District failed to identify G.A. for special education services in a timely fashion. Therefore, in 2007 the Panel received evidence on this issue over the course of two days. At the first hearing in 2005, however, the Panel heard evidence on the second issue (the appropriateness of the IEP) over the course of five days. Therefore, the Panel determined it was not necessary to hear evidence on this issue because the Panel could review the record to make this decision. (8/1/07 Panel decision at 2). While there was no new evidence presented in 2007 on this second issue, the parties were permitted to argue this issue in their closing statements.

The final issue considered on remand was the remedy, if any. The Panel was directed by the Family Court to only reach this issue if it concluded the District should have identified G.A. as a child eligible to receive services under the IDEA sooner, or if the Panel found the IEP was inappropriate. Limited evidence was presented on remand concerning the appropriate remedy.[5]

---

[5] The only testimony concerning the remedy comes from Mrs. Warner, who testified, counter to the mother's contention, she does not recall recommending to the mother that she hire a private tutor for G.A. Such a recommendation for tutoring would be contrary to Mrs. Warner's testimony that she felt G.A. was over-supplemented already. (T-254 5/24/07)). The Parents declined to introduce any other evidence concerning the remedy.

Following the two day hearing in 2007, the Panel rendered a unanimous 27 page opinion on August 1, 2007, finding in favor of the District on all allegations except for finding that the District should have evaluated G.A. after the Parents request to do so on February 3, 2004. According to the Panel, the District should have completed this evaluation prior to May 20, 2004 (i.e. within 45 days of the request). Consequently, the Panel ordered the District to reimburse the Parents for the out of pocket expenses they incurred with Sylvan Learning Center, and a private tutor for the period of time from May 20, 2004, through the end of the 2003-2004 school year. The Parents were ordered to provide verification of these out of pocket expenses by submitting bills or canceled checks to the District's counsel within thirty (30) days of August 1, 2007. The District was afforded thirty (30) days to reimburse the Parents. Pursuant to the Panel's decision, if the Parents failed to provide verification of the expenses, the District had no obligation to provide reimbursements.[6]

In this action, the Parents seek judicial review of the Panel's decision pursuant to 20 U.S.C.A. § 1415(i)(2)(A). They seek (i) a finding that the defendants did not timely engage in Child Find; (ii) a finding that the IEP offered for the 2004-2005 year was inappropriate; (iii) an order for "monetary compensatory education" to provide tuition and all related costs for intensive remedial private education; (iv) tuition reimbursement; (v) attorneys fees; (vi) expert witness fees; (vii) litigation expenses; and (viii) other relief.

Discovery is complete (D.I. 11), and the administrative record has been filed with the Court (D.I. 24). On August 20, 2008, the District and Superintendent Dr. Susan Bunting ("Bunting") filed a motion for summary judgment seeking dismissal of all counts of the

---

[6] The Defendants take exception to the Panel's finding that the District failed to timely conduct evaluation requested on February 3, 2004. However, argument on this issue is reserved because this issue is moot. The Parents failed to provide verification of expenses as directed. (8/1/07 Panel decision at 26).

Complaint.  This is the District's and Bunting's Opening Brief in Support of Their Motion for

Summary Judgment.

## SUMMARY OF ARGUMENT

Given the expertise of a special education panel, its demonstrated knowledge of the evidence and its correct application of the law to the facts, the Court should afford considerable weight to the Panel's findings.

The record overwhelmingly supports the Panel's conclusion that the District fulfilled its Child Find obligation.

The Child Find claim is moot because G.A.'s programming and services would not have been significantly different than what the District provided had she been identified as eligible to receive services under the IDEA sooner.

G.A.'s IEP was reasonably calculated to provide meaningful educational benefit as the Panel determined the overwhelming evidence demonstrates.

Because the IEP and placement were appropriate, the Parents are not entitled to tuition reimbursement or the costs of unilateral private placement.

The unreasonableness of the Parents' conduct in this case warrants a denial of relief.

Bunting must be dismissed as a defendant because she was not yet hired by the District as the superintendent when G.A. was enrolled in the District.

The Panel made no adverse evidentiary rulings relevant to the Parents' case which implicate Federal Rules of Evidence 401 or 702.

Given the complete failure of the IDEA claims, the claims under Section 504 cannot be sustained.

No relief is due because there was no deprivation of FAPE.

Attorneys fees are not available because Parents did not have an attorney.

The claims under 42 U.S.C.A. § 1983 must be dismissed because violations of Section 504 and the IDEA cannot give rise to a cause of action under Section 1983.

1823386/1

## RELEVANT FINDINGS OF FACTS MADE BY THE PANEL

1.    Prior to her enrollment in the District, G.A. attended public school in White Plains, New York where she received accommodations under a 504 Plan. (DE-8-4; PE-7-17).

2.    On 12/20/03, six months before G.A. was enrolled in the District, the school district in White Plains, New York, after considering a social history, classroom observations, teacher reports, a psychological evaluation, a speech/language evaluation, an audiological evaluation, an OT evaluation, and a physical examination, determined G.A. was not eligible for special education services. (PE-7-11).

3.    On 6/13/03, G.A. was enrolled in third grade at Lord Baltimore Elementary School ("Lord Baltimore") in the District. (DE-8-2).

4.    In 9/03, G.A. began attending third grade at Lord Baltimore and Connie Warner ("Warner") was her assigned regular education teacher. (T-8 (1/24/05)).[7]

5.    On 9/22/03, an initial conference was held to review the NY 504 Plan and it was determined that G.A. would remain on a 504 Plan. The team established classroom accommodations at this conference. The Parents were part of this team and agreed to the accommodations. (DE-8-5; PE-7-18).

6.    Following the conference, the Parents requested and gave permission for an OT evaluation. (DE-8-5).

7.    On 9/25/03, Eleanor Gregory ("Gregory") performed an OT evaluation and concluded that direct OT was not needed but that the OT would consult with the teacher if the teacher felt it was indicated. (DE-8-7).   Gregory believed that the 504

---

[7] All transcript citations will be cited herein as "T-page number(s) (date)."

Plan adequately addressed the weaknesses in visual perception and visual motor skills indicated by the OT evaluation she performed. (T-80-94 (2/15/05)).[8]

8.    Results of the OT evaluation were discussed at a conference on 10/15/03 and it was decided that Gregory would consult with Warner on an as needed basis up to two times per month.  The mother was present for said meeting.  (DE-8-10; T-112 (1/20/05); T-17-18 (1/24/05)).

9.    The Parents argued that Gregory was instructed to perform a "sensory awareness" (tactile and vestibular) evaluation and that she did not perform a sensory motor evaluation as requested. (DE-8-5; T-100 (2/15/05); T-9 (2/15/05)).  There is no evidence to support this position.

10.   Warner gave the mother her home phone number and encouraged her to call if there was a problem.  She talked to the mother by phone and met with her when the mother asked to meet with her.  She testified that they had at least two phone conferences and five meetings.  (T-19-20 (1/24/05)).

11.   As of 10/2/03, G.A.'s mid-marking period progress report for the first quarter indicated her grades were 65 in math, 70 in reading, 76 in English and 74 in spelling on a scale where 70 or above is a passing score.  Her handwriting was marked satisfactory (S).  (DE-8-8; PE-7-20).

12.   G.A.'s first marking period report card indicated that she scored 70 or above on all of her core subjects except for a 63 in math.  (DE-8-11; T-39 (1/24/05)).

---

[8] Parents allege on appeal this evaluation was not appropriate because Gregory was not qualified, trained and knowledgeable. (see D.I. 1, ¶ 34).  To the contrary, Gregory is a nationally certified occupational therapist.  (DE-8-7).  Moreover, the Family Court held that the OT evaluation would be a proper inquiry on remand. (decision attached as Exhibit 1).  However, on remand, Parents presented no evidence on this issue.

13.    Mother admitted the curriculum at LBES was harder than the curriculum at G.A.'s school in New York. (DE-8-14)

14.    The services recommended by District officials to improve G.A.'s educational performance during the later half of the first marking period were provided at the parents' expense.  G.A. received instruction from Sylvan Learning Center two times per week and private tutoring by Jessica Norwacki one time per week. (DE-8-14; T-39 and 52-54 (2/24/05)).

15.    The 12/8/03 mid-marking period progress report revealed that G.A.'s grades improved slightly and were 80 in reading, 70 in math, 76 in English, and 85 in spelling.  However, she received unsatisfactory remarks from her teacher in areas such as Expected Behaviors and Works Independently. (DE-8-10; PE-7-22).  This was the same time period when G.A. was receiving services outside of school as arranged by the Parents.

16.    G.A.'s grades for the second quarter showed that she scored 70 or above in all subjects except math which was a 68.  (DE-8-28).

17.    Warner had prior experience working with children with auditory processing issues. Indeed, Warner's daughter had the same disability, and Warner was a regular education team teacher with Jan Drake, a special education teacher at Lord Baltimore, for 4 years.   In that setting, they worked with children with auditory processing issues.  (T-11 (2/24/05)).

18.    Warner used a multi-sensory approach in the classroom.  (T-11 (1/24/05)).

19.    The Parents never expressed dissatisfaction with Warner's teaching, nor did they ask her to modify the classroom accommodations.  (T-13-14, 34 (1/24/05)).

1823386/1

20.  Warner referred G.A. to the Host Mentoring Program and to a small group reading program. These pull out programs addressed reading problems during the school day. Parents removed G.A. from these interventions without the benefit of consulting with G.A.'s teacher because it was their view G.A. should be in the classroom with Warner. (T-41-42 (1/24/05)).

21.  In January, 2004, an independent OT evaluation performed by J. B. Haughey of Easter Seals, at the expense of Parents, recommended therapy two times per week. (DE-8-12).

22.  Haughey never contacted the classroom teacher and was unable to give an opinion as to whether the Easter Seals OT objectives had any relationship to the work G.A. was doing in school because she had never observed her in the school setting. (T-291 (2/15/05)).

23.  On 2/3/04, before a 504 meeting, Parents received a letter from the District notifying them that G.A. was in danger of retention because she had not met the criteria for math. (DE-8-13).

24.  At the 2/3/04 meeting, the mother requested further evaluations in the areas of achievement and personality. (DE-8-14). A Conner's Rating Scale was completed by the teacher and parent. A Conner's Rating Scale is a behavior rating scale and not a personality test. There was no evidence presented to prove that an achievement or a personality test was performed as a result of mother's request.

25.  G.A.'s 2/25/04 mid-marking period progress report for the third quarter indicated she scored above 70% on all of her core subjects, her handwriting was satisfactory, and she was complying with all expected behaviors. (DE-8-16; PE-7-26).

1823386/1

26.   G.A.'s grades for the third quarter showed that she scored greater than 70 in all subjects with the exception of her 67 in math. (DE-8-28).

27.   On 3/3/04, the District's speech pathologist, Paula Howard, conducted a 504 conference to discuss G.A.'s grades and recent testing. (DE-8-18; PE-7-27).  It was agreed that she would take the State test in a small group with additional time and emphasis on re-reading and re-focusing.  The minutes show G.A. was using the Earobics program at that time.  (T-48 (1/24/05)).

28.   On 3/11/04, G.A. took the State test (DSTP) and scored below the standard required for promotion to fourth grade.  (DE-8-19).

29.   On 4/28/04, Parents sent an e-mail memo to Darlene St. Peter ("St. Peter"), the District's Special Education Director, acknowledging G.A. would be retained in the third grade grade, but asking for a team room setting and a "full educational, psychological, speech and language (please include auditory processing); neurological and physical/occupational assessments". (PE-7-31).

30.   The 5/4/04 mid-marking period progress report for the fourth quarter showed that G.A. scored 61 in reading, 61 in math, 68 in English, and 78 in spelling, satisfactory in all but one expected behavior, and satisfactory in her ungraded subjects, including handwriting. (DE-8-21; PE-7-33).

31.   On 5/18/04, Charles Rechsteiner ("Rechsteiner") performed a psycho-educational assessment.  The test revealed that G.A. is of average intelligence, with average cognitive skills except in the area of visual-spatial reasoning with abstract concepts and pattern recognition.  She scored in the average range on word identification. However, in reading comprehension she scored on a grade equivalent (GE) level of

1.8 years representing a severe discrepancy from her ability as indicated on the intelligence and achievement tests. (DE-8-36). Rechsteiner recommended that an IEP team meet and determine whether G.A. qualified for special education services as a child with a learning disability. *Id.*

32. On 5/26/04, the District notified Parents that G.A. did not meet the State standards in reading and math and offered her a two week remedial course called "Immersion in Learning" that was tailored to address the reading and math deficits indicated on the DSTP. (DE-8-37).

33. On 5/28/04, Parents notified the District that they did not want G.A. removed from her regular classroom to participate in the Immersion in Learning Program because they wanted her in the classroom with Warner as much as possible. (DE-8-38).

34. Warner and Rhonda Lynch (school guidance counselor) testified that in late May 2004, G.A. told them she would be attending Lighthouse Christian School ("LCS") in September, 2004. (T-263, 267 (1/20/05); T-56 (1/24/05)).

35. On 6/2/04, an IEP team meeting was scheduled to meet on 6/11/04 in order to discuss G.A.'s special education needs. On 6/3/04, Parents completed an IEP input form on which they listed G.A.'s areas of weakness as reading comprehension and math. They noted she was failing although "she has been tremendously supported throughout the school." (PE-7-39).

36. Parents took G.A. to Dr. Blackburn, OD, for visual testing. He issued a report to the local referring optometrist dated 6/4/04 indicating problems with eye coordination, eye convergence and eye tracking. He prescribed glasses and 18-24 hours of vision therapy in his office with supplemental home therapy. A separate 6/6/04 report to

Parents addressed a bottom line deficit in site word decoding and suggested a multi-sensory structured reading program using phonetic principles. (PE-7-40).

37.    The meeting scheduled for 6/11/04 was rescheduled to 6/14/04. At that meeting, Rechsteiner reviewed the results of his assessment and his recommendation that G.A. had a mild learning disability in reading comprehension based on the guidelines contained in AMSES.[9] (T-214, 220 (1/20/05)).

38.    On 6/14/04, Parents accepted the recommendation of the District's psychologist (Rechsteiner) that G.A. was learning disabled in reading comprehension based on a severe discrepancy between ability and achievement. (DE-8-27; PE-7-43). The District team classified G.A. "Learning Disabled" as a student with a disability in reading comprehension. (DE-8-27). There was no evidence presented at either hearing indicating that Parents disputed the fact that G.A. was learning disabled in reading comprehension only and not learning disabled in math as well.

39.    The IEP team, including Parents, agreed that G.A. would be retained in third grade in a team room setting with a certified special education teacher. (Id.; PE-7-43). This decision was consistent with mother's letter of 4/28/04 requesting a team room setting. (PE-7-31).

40.    After the 6/14/04 meeting, Drake, who was then the special education coordinator, prepared a proposed IEP. The proposed IEP was considered at the team meeting on 7/9/04. (DE-8-29; T-223 (1/20/05)).

41.    At the 7/9/04 IEP meeting, the IEP team discussed classroom accommodations including a soundfield system to address G.A.'s disability in reading comprehension.

---

[9] "AMSES" means the Delaware Department of Education's Administrative Manual for Special Education.

The IEP team also discussed accommodations to address math reasoning, listening comprehension and processing, anxiety, graphomotor (handwriting) skills, and a plan for a follow up consult with the OT. The plan included goals and objectives for reading comprehension which was G.A.'s only area of diagnosed learning disability. (DE-8-29, page 3-4; DE-8-30; PE-7-44; T-132-137 (2/15/05)).

42.    Mother signed the 7/9/04 IEP meeting notes indicating she agreed with the plan. The notes from the 7/9/04 meeting state that mother was going to discuss the IEP with father and make a decision on G.A.'s academic career for the 04-05 year. At the beginning of the meeting mother stated that the family had not decided whether G.A. would be attending Lord Baltimore in the upcoming school year. (DE-8-29).

43.    Twelve days later, on 7/21/04, the mother went to Lord Baltimore and met with Janet Hickman. Mother signed the IEP indicating that she did not agree with the proposed plan or the proposed placement. (DE-8-30; T-172 (1/24/05)).

44.    Parents enrolled the student in Lighthouse Christian School ("LCS") on or about 8/3/04 when they paid her annual tuition for the 2004-05 school year. (DE-8-46).

45.    On 8/20/04, prior to the start of the 2004-2005 school year, Parents sent Hickman a certified letter informing her that G.A. would be attending LCS because Lord Baltimore had failed to provide a concise plan on how to address G.A.'s learning disability and gave four reasons to support their conclusion. (DE-8-31; PE-7-47). The four reasons stated in the letter are identical to paragraphs (5) through (8) of Parents' letter requesting a due process hearing. (DE-8-1; PE-7-47).

46.    October 1, 2004, G.A.'s grades from the LCS were: math 92; reading 84; history 97; spelling 98; science 96; handwriting 92; Bible 95; language 89. (PE-7-49). There was

no evidence presented that the programs at LCS and Lord Baltimore were comparable. Therefore, the panel could not compare G.A.'s progress in the two schools. (PE-7-49)

47.    There was evidence presented that G.A. was receiving <u>none</u> of the services at LCS that Parents were requesting be provided by Lord Baltimore. (T-13-21, 72-75 (3/15/05)). However, she was receiving excellent grades.

48.    There was also evidence presented that Parents did not fill G.A.'s eye glass prescription until September, 2004, and that she was not wearing the eye glasses at school in LCS. (T-15-16 (3/15/05); T-47 (3/15/05)).

49.    Parents presented no non-hearsay evidence as to the amount of money they are requesting to be reimbursed for private school placement or related costs for enrollment in an intensive remedial language based program designed to address all of G.A.'s unique needs in a small group setting and continuing until such time as G.A.'s achievement is commensurate with her age appropriate peers.

1823386/1

**ARGUMENT**

I.    **GIVEN THE EXPERTISE OF A SPECIAL EDUCATION PANEL, ITS DEMONSTRATED KNOWLEDGE OF THE EVIDENCE, AND ITS CORRECT APPLICATION OF THE LAW TO THE FACTS, THE COURT SHOULD AFFORD CONSIDERABLE WEIGHT TO THE PANEL'S FINDINGS**

Summary judgment is appropriate when the record demonstrates there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When considering a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-moving party. The opposing party cannot, however, create a genuine issue of material fact by merely relying upon the pleadings, or bald allegations. *Celotex Corp.*, 477 U.S. at 322; *Beale v. Hardy*, 769 F.2d 213 (4th Cir. 1985). A motion for summary judgment can only be defeated if the non-moving party sets forth specific facts and affirmative evidence showing there is a genuine issue of material fact. *Celotex Corp., supra.*

A particular scope of review applies to IDEA cases. Under the federal statute, a District Court reviewing an administrative decision shall: (a) receive the records of the administrative proceedings; (b) hear additional evidence at the request of a party; and, (c) basing its decision on a preponderance of the evidence, shall grant such relief as the Court determines is appropriate. 20 U.S.C.A. § 1415(i)(2)(C).

The Parents did not take any discovery to support their claims, and the time to do so under the Scheduling Order has passed. (D.I. 11). Even if there were such a request, the Court is not required to accept additional evidence on the request of a party. The Court has the ultimate discretion to determine what constitutes "additional evidence" within the meaning of § 1415(i)(2)(B). *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir. 1995); *Fuhrmann v.*

*East Hanover Bd. of Educ.*, 993 F.2d 1031 (3d Cir. 1993); *Bernardsville Bd. of Educ. v. J.H.*, 42 F.3d 149, 161 (3d Cir. 1994); *Town of Burlington v. Dept. of Educ.*, 736 F.2d 773 (1st Cir. 1984), *aff'd on other grounds*, 471 U.S. 359 (1985). In fact, the Third Circuit directed district courts to use "particularized discretion" when deciding whether or not to admit additional evidence. *Susan N.*, 70 F.3d at 760-761. The "additional evidence clause" in § 1415 does not allow witnesses to repeat or embellish their prior administrative hearing testimony. In addition, wholly irrelevant or cumulative evidence does not constitute "additional evidence" within the meaning of § 1415. *Id.*; *Bernardsville*, 42 F.3d at 161; *Town of Burlington*, 736 F.2d., at 790-791.

Whether the Court hears additional evidence or not, the United States Supreme Court has instructed courts to give "due weight" to the administrative findings when reviewing an administrative due process decision under § 1415. In the seminal case of *Board of Education of Hendrick Hudson Central School District. v. Rowley*, 458 U.S. 176 (1982), the United States Supreme Court recognized Courts do not have expertise in educational policy. While District Courts are empowered to review the substance of a disputed educational placement or program, the United States Supreme Court has cautioned this grant of authority is not "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Id.* at 206-207. The purpose of the "due weight" standard is to prevent the Court from imposing its view of preferable educational methods upon the states. *Oberti v. Bd. of Educ.*, 995 F.2d 1204, 1214 (3d Cir. 1993).

In addition to affording "due weight" to the administrative findings, a District Court must also engage in an independent review of the administrative record and determine whether

IDEA's "procedural" and "substantive" requirements have been satisfied.[10] *Rowley,* 458 U.S. at 206-207.  The interplay between the United States Supreme Court's "due weight" interpretation and the IDEA's provision for independent judicial review has led to a scope of judicial review often described as a "modified *de novo* review."  *Murray v. Montrose County Sch. Dist.,* 51 F.3d 921, 927 (10th Cir. 1995); *Oberti,* 995 F.2d at 1214.  Unlike other circuits, the Third Circuit places the burden upon the school district to prove it satisfied its obligations under the IDEA, even when the school district was the successful party at the due process hearing.  *Carlisle Area Sch. v. Scott P.,* 62 F.3d 520 (3d Cir. 1995); *Oberti,* 995 F.2d at 1219-1220; *Coale v. State Dept. of Educ.,* 162 F. Supp.2d 316, 324 (D. Del. 2001).  When a student, however, seeks tuition reimbursement for private placement, the student bears at least part of the burden of proof.  *See Ridgewood Bd. of Educ. v. N.E.,* 172 F.3d 238 (3d Cir. 1999); *Coale,* 162 F. Supp.2d at 324 n.7; *Florence County Sch. Dist. Four v. Carter,* 501 U.S. 7 (1993).  The Parents also bear the burden of proof concerning the appropriateness of the IEP. *Schaffer v. Weast,* 546 U.S. 49, 62 (2005).

The record demonstrates the District timely identified G.A. as a student eligible to receive special education services and developed a tailored curriculum designed to meet G.A.'s needs.   The Panel's decision is orderly, logical, and supported by the administrative record. Equally important, the Panel correctly applied the law to the facts, and provided detailed factual findings, as well as a thorough application of the law to the facts in its 27 page decision.  Given the expertise of the panelists, their demonstrated knowledge of the law, and the evidence they

---

[10] At the administrative level and again here on appeal, the Parents allege the District failed to identify GA as a student eligible to receive special education services and failed to propose an appropriate IEP.   There is no "procedural" allegation (e.g., that the IEP team was not appropriately composed, there was a failure to provide required notices of meetings, etc.). Consequently, there is no need for the Court to consider procedural violations.

had before them, the Court should afford considerable weight to their factual findings and conclusions. *See also Coale,* 162 F. Supp.2d at 331 n.18.

## II.    THE RECORD OVERWHELMINGLY SUPPORTS THE PANEL'S CONCLUSION THAT THE DISTRICT FULFILLED ITS CHILD FIND OBLIGATION

The "Child Find" issue in this case is whether the District timely identified G.A. as a special education student.[11] As the Panel noted, federal and state law entitle G.A. to a free appropriate public education if she meets the criteria to be identified as a student with a disability under the IDEA and Chapter 31.

The Child Find requirement of the IDEA imposes an affirmative obligation on local school districts to identify, locate, and evaluate all children who have disabilities residing within the jurisdiction who: (a) have disabilities and need special education and related services as a result, or (b) are suspected of having disabilities and being in need of special education and related services. Because the Child Find obligation is an affirmative one, a parent is not required to request a school district identify and evaluate a child. *Robertson County Sch. Sys. v. King,* 99 F.3d 1139 (6th Cir. 1996).

A student is eligible for special education under the IDEA and Chapter 31 *only* if the student meets the eligibility criteria under one or more disability categories, including learning disabilities. 34 C.F.R. § 300.7(c)(10). An "initial evaluation" is the procedure for assessing whether a child has a disability *and* needs special education. A school district must conduct an initial evaluation when it suspects a child has a disability *and* needs special education. In order to qualify for special education services when a student has a learning disability, there must be a

---

[11] For sake of argument only, the Defendants concede the Panel's decision the District failed to timely evaluate G.A. following Parents' February 3, 2004 request for an evaluation was correct.

"severe discrepancy" between ability and achievement as determined by psycho-educational testing done by a school psychologist. (AMSES § 4.83).

As a preliminary matter, the precise "disability" the District is alleged to have not discovered timely remains a mystery. Parents opted not to identify the purported undiscovered disability.[12]    Parents stipulated G.A. does not have ADHD. (T-63 (5/30/07)). Over the course of seven hearing days, there was a significant amount of discussion regarding G.A.'s need for occupational therapy ("OT") services, but the need for OT services cannot be the subject of the Child Find inquiry because (i) OT services were reduced to a consult basis by G.A.'s former school district before she arrived in the District, (ii) the District conducted an OT evaluation within weeks of G.A. beginning to attend school in the District,[13] and (iii) Parents did not challenge the OT evaluation at the 2007 hearing where Child Find was at issue. During the 2007 hearing dates, her mother mentioned that G.A. struggled with mathematics. (T-100 5/30/07)). However, the Panel found that Mr. Rechsteiner's evaluation of G.A. in 2004 considered whether G.A. was eligible to receive services under the IDEA for math, and concluded she was not eligible.[14]    (8/1/07 Panel decision at 19) Indeed, she had a severe discrepancy in reading comprehension only. (Id.) The Panel found the Parents presented no evidence to show that G.A. had a severe discrepancy in math. (Id.) Therefore, to the extent the Parents contend G.A. should

---

[12] Presumably, the nature of G.A.'s disability would have come out as part of the Parents' case in chief. However, the Parents declined to put on a case except for their examination of certain of the District's witnesses.

[13] To the extent the Parents contend the District failed to fulfill their Child Find obligations concerning OT services, the District received records from White Plains on August 6, 2003. On September 10, the District sent out notice of a meeting to address OT. On September 23, there was a meeting concerning OT which the mother attended. On September 23, permission to evaluate was granted. On September 25, G.A. was evaluated. On October 15, 2003, there was a meeting to discuss the results of the OT evaluation. (T-84-92 5/24/07). It is incredulous to suggest a school district could have been any more responsive.

[14] She was also found not to be eligible for math by the White Plains School District. (PE-7-11).

have been identified as learning disabled in mathematics, the Panel's decision should be affirmed because there is no evidence to support such contention, and Rechsteiner's evaluation shows her learning disability was limited to reading comprehension only.

The Parents allege the District should have identified G.A. as a special education student sooner. However, how much sooner the Parents do not make clear. Certainly, G.A.'s improving performance through January, both in terms of her grades and her Star Reading scores, (T-149 (5/24/07)) and the fact the District had documentation from New York saying G.A. did not qualify for special education services, obviate any argument that the District should have identified G.A. as a child eligible to receive special education services prior to January, 2004. In fact, the District was prohibited by law from reevaluating G.A. within one year of the White Plains School District's determination (on December 20, 2002), since reevaluations may not occur more frequently than annually unless both the parents and district agree. *See* 20 U.S.C.A. § 1414(a)(2)(B)(i). Consequently, as a matter of law, the Parents' Child Find claim fails to the extent Parents claim G.A. should have been identified prior to December 20, 2003 (i.e., one year after the White Plains evaluation).

Since the law largely bars the Child Find claim, essentially what remains of the claim is that identification should have occurred between December 20, 2003 and February 3, 2004. However, the Panel found that the District demonstrated "there were no red flags" which required the District to conduct an evaluation prior to February 3, 2004. The Panel made a number of findings which support this conclusion. These include the following:

- G.A. came to the District with a file from her previous school in White Plains, New York. In that file, it was noted that, as of December 20, 2002, six months before enrolling

1823386/1

in the District, G.A. was determined to <u>not</u> be eligible for special education services. (8/1/07 Panel decision at 9 and 19)

·    G.A. had recently moved to the area and was adjusting to a new home, new friends, and a new school, and the District's curriculum was harder than her previous school, according to her mother. (8/1/07 Panel decision at 19)

·    When her grades started to slide in the third marking period, this time coincided with when her brother may have been ill,[15] there was a death in the family, and father was out of the home on business much of the time.

·    The Panel noted that "[a]ll of these factors, could affect a child's learning." (8/1/07 Panel decision at 20).

Additional substantial evidence supports these findings and the Panel's conclusion that that the District was correct in not evaluating G.A. prior to February 3, 2004.

## <u>Ruling Out Other Causes</u>

First, the District had to rule out other causes before rushing to identify G.A. for special education services. A school district cannot, by law, identify a child as eligible to receive special education services without fulfilling numerous procedural prerequisites first. AMSES § 4.8.1. A district cannot even evaluate a child for purposes of special education before interventions are documented. *Id.* Before a child can be identified as eligible to receive special education services, the District is required to rule out other potential causes of the student's declining

---

[15] We say "may have been ill" because the evidence was that G.A. was telling teachers and her counselor that her brother was ill and had been in the hospital but her mother told the Panel this was not true.

educational performance.  (T-92-93, 114 (5/24/07); T-44-45 (5/30/07)).  Naturally, it takes some time to complete the ruling-out process.

Many things had to be ruled in G.A.'s case.  As a matter of law, familial, stressful, anxiety-producing, and other environmental issues are not reasons to identify a child as learning disabled.  34 CFR § 300.541.  In G.A.'s case, these issues were legion, including (in addition to the factors noted by the Panel): G.A. was impulsive, did not slow down or focus on her work, and did not recheck her work (T-124, 126-127 (5/24/07));  G.A. may have experienced perfectionism anxiety and social concerns outside of the school (T-127 (5/24/07));  she needed glasses (T-129 (5/24/07));  G.A. may have been affected emotionally by the September 11 lockdowns at her school in New York (T-130 (5/24/07);  G.A. had most of her absences from school towards the end of the school year, which coincided with her decline in academic performance  (T-131 5/24/07);  there were problems in the home; (T-215 (5/30/07)); it had been difficult for G.A. while the mother was tending to G.A.'s sick brother in the hospital, so it was just the father in the house taking care of G.A.; (T-216-217 (5/30/07)); she missed her friends in New York and was having trouble sleeping (T-217 (5/30/07)); and she told her teachers of late nights out on school nights and appeared tired to her teachers. (T-255-256 (5/24/07); T-182 (5/30/07)).  These are factors that can cause declining academic performance and had to be ruled out.  (T-101-132 (5/24/07); T-68-70 (5/30/07; Panel decision at 20).  In fact, even Parents saw the need to rule out potential performance hindering causes, and requested that other potential causes of G.A.'s performance be ruled out in February, 2004. (T-125 (5/24/07)).

Another important issue the District had to rule out was the change from one school to another as a cause of G.A.'s difficulties.  By law, a lack of instruction in a subject, and a more rigorous curriculum, are not reasons to identify a child as eligible to receive special education

services. (T-66 (5/30/07; 34 CFR § 300.534).    Overwhelming evidence in the record

demonstrates G.A. may have had issues due to the change from one school to another.  G.A.'s

mother complained that the curriculum at the District was more rigorous than it was in White

Plains. (T-254 (5/24/07)).  The District scores highly on the State's standardized testing.  (T-160

(5/24/07)).  It is a common complaint of parents of students who transfer into the District that the

curriculum is challenging.   (T-108 5/24/07)).   In fact, many support classes are composed

primarily of students who transferred to the District. (T-160 5/24/07).  Frequently, these children

have gaps in learning when coming from another district.  (T-254 5/24/07).  Importantly, such

gaps do not equate to learning disabilities, and time was needed to sort out what was causing

G.A. to struggle at the end of the school year.  All of these factors support the Panel's decision

that the District correctly followed procedure in identifying G.A.

### The District Acted Promptly

Second, the evidence demonstrates the District acted promptly and did not ignore G.A.'s

issues.   When Warner noticed G.A. was not performing well, she provided her with extra

support. (T-260 5/24/07).  She contacted the mother.  *Id.*  She had many conferences with the

mother (indeed, the mother was calling Mrs. Warner at home). (T-252 (5/24/07)).    Warner

monitored G.A.'s homework and class work, provided extra small group instruction, offered the

services of a volunteer, and worked with a volunteer. (T-252-253 (5/24/07)).   She provided G.A.

with the Earobics program, which is a nationally-recognized phonics based program to help with

reading. (T-262 (5/24/07)).

In addition to Warner, others at the District responded immediately to G.A.'s decline in

her grades: G.A. was sent to see the reading teacher multiple times per week, (T-176 (5/30/07));

the IST team met and considered G.A.'s situation on February 3, 2004, (T-91 (5/24/07)) and on

March 3, 2004 reviewed and suggested evaluations, (T-93 (5/24/07));     also, the District monitored G.A.'s progress using the Star Reading program.  Every few weeks, the District was meeting, gathering data, reviewing results, and taking action.[16]

## Other Interventions Required

Third, Delaware law requires other interventions before a district may consider referring a student for special education.  In order for the IEP team to consider G.A.'s eligibility for special education services, the following was necessary: (1) written documentation of the formal interventions used with G.A.; (2) a comprehensive psychological evaluation; and (3) a severe discrepancy between achievement and intellectual ability.   AMSES § 4.8.1- 4.8.3.  Therefore, the District could not have rushed (without parental request) to send G.A. to the special education department to be evaluated for eligibility before trying other interventions first.  Consistent with the law, the District involved its IST team as a first step early in G.A.'s education.  It first met in October, shortly after G.A. arrived at the District to consider her need for OT services.  It met again in February and March to consider what else needed to be done, and what had to be ruled out.

## Recent Findings of Ineligibility

Lastly, the Panel's decision is bolstered by the fact there were recent findings by the White Plains School District that G.A. was ineligible to receive services.  Indeed, these findings occurred in the very year prior to G.A.'s enrollment in the District.  The White Plains School District completed a psychological assessment on September 30, 2002, which determined G.A. did not have a learning disability.  (PE-7-6; T-164 (5/24/07)).  The White Plains School District

---

[16] To the extent it was possible for the District to act even faster, there were periods of non-instruction occurring for five days in March due to the DSTP, and approximately 10 days in April for Spring Break. (T-153 (5/24/07)).

also determined on December 20, 2002 that G.A. was not eligible to receive special education services. (PE-7-11).

### III. THE CHILD FIND CLAIM IS MOOT BECAUSE G.A.'S PROGRAMMING AND SERVICES WOULD NOT HAVE BEEN SIGNIFICANTLY DIFFERENT THAN WHAT THE DISTRICT PROVIDED HAD SHE BEEN IDENTIFIED AS ELIGIBLE TO RECEIVE SERVICES UNDER THE IDEA SOONER

The IEP team identified G.A. as eligible to receive services under the IDEA at their June 14, 2004 meeting. (DE-8-27). Parents contend the District should have identified her sooner than May 20, 2004 (which was the date by which the Panel determined an evaluation should have been done as a result of the February 3, 2004 request). Even if Parents are correct, no relief is warranted because her programming and services would not have been significantly different had she been identified sooner.

Warner thought G.A. may have been receiving too much supplementation. (T-255 (5/24/07)). Indeed, Warner testified she told the mother to stop overwhelming G.A. with supplementation. (T-254 (5/24/07)). The mother admits G.A. was "tremendously supplemented throughout the year." (*Id.*, Parent IEP Input Form).

#### Interventions Provided or Offered

The District provided or offered the following regular education interventions that very much replicated "special education" services to G.A., even though she was not at the time identified as eligible under the IDEA:

1.      The District accepted and agreed to provide the 504 accommodations enacted by the White Plains School District. Warner testified she was aware of the accommodations and she implemented them in her classroom. (T-267 (5/24/07)). While these are "504" accommodations, they closely resemble IDEA services.

25

2.      Warner used a multi-sensory approach to learning (T-264 (5/24/07)), which is the same approach Mother said G.A. needed. (DE-8-27, Parent IEP Input Form).

3.      Warner used small group instruction nearly every day (T-248-249 (5/24/07)), which, again, is the same approach Mother said G.A. needed. (DE-8-27, Parent IEP Input Form).

4.      The District offered a volunteer to assist G.A. 1-on-1 with reading. (T-253 (5/24/07)).

5.      G.A. met at least 2 times per week with the reading teacher.[17] (T-176 5/30/07)). The reading teacher is a highly qualified teacher and certified reading specialist (T-176, 178 (5/30/07)), who taught regular education students (T-177 (5/30/07)), such as G.A., using a multi-sensory approach to reading. (T-181 (5/30/07)). There were only four to twelve children in class when G.A. went to see the reading teacher. (T-177 (5/30/07)). The reading teacher was trained in the Orton-Gillingham program. (T-198 (5/30/07)). This was the preferred program for G.A. over other reading programs, because G.A. did not have decoding issues, which the parent-requested Wilson program would address; rather, she had comprehension issues, which Orton-Gillingham was tailored for. (T-185-186 (5/30/07)).

6.      The District used the Earobics program to supplement G.A.'s reading. (T-138 (5/24/07)).

7.      Warner provided G.A. preferential seating, offered her extra time to complete tasks, and re-read instructions to her. (T-251 (5/24/07)).

---

[17] Sending a student to the reading teacher is not indicative of a need to identify the student as eligible to receive special services or refer the student to the IST. Children learn at different rates. (T-112, 264 (5/24/07)).

The only logical conclusion is G.A. received continual services, support, assessment and monitoring, whether or not she was formally identified as eligible under the IDEA as learning disabled in reading comprehension. Consequently, there was no deprivation even if the District was late in identifying G.A. as eligible under the IDEA.

## IV.  G.A.'S IEP WAS REASONABLY CALCULATED TO PROVIDE MEANINGFUL EDUCATIONAL BENEFIT AS THE PANEL DETERMINED AND THE OVERWHELMING EVIDENCE DEMONSTRATES

In *Rowley*, the Supreme Court considered the IDEA's requirement of a free appropriate public education. The education, the Court said, must be "tailored to the unique needs of the handicapped child by means of an 'individual education program,'" commonly known as the "IEP." 458 U.S. at 181. The IEP should be "reasonably calculated to enable the child to achieve passing marks and advance from grade to grade." *Id.* at 203-204. Stated another way, the education provided must be sufficient to confer some educational benefit upon the child with a disability. *Id.* While no bright line rule exists defining "educational benefit" with precision in *Coale*, the Third Circuit interprets the "educational benefit" standard to require a child to receive "more than a trivial educational benefit" or "*de minimis* educational benefit." 162 F. Supp.2d at 324, 334. The Third Circuit held an IEP must offer "meaningful educational benefit." *Ridgewood*, 172 F.3d at 247; *Carlisle*, 62 F.3d at 533-534; *Polk v. Cent. Susquehanna Intermediate Unit*, 853 F.2d 171, 180 (3d Cir. 1988).

At the same time, there is no requirement the school district maximize the potential of a child. *Rowley*, 458 U.S. at 198. School districts are not required to provide the optimal level of services, or even a level that would confer additional benefits, since the IEP required by IDEA, represents only a "basic floor of opportunity." *Id.* at 200. The essential question for the Court is whether the IEP proposed by the District was, *at the time it was*

*proposed*, reasonably calculated to provide G.A. meaningful educational benefit. *Coale,* 162 F.

Supp.2d at 326; *Susan N.*, 70 F.3d at 760-762; *Fuhrmann,* 993 F.2d at 1040-1041. The main

thrust of IDEA is to provide equal access to education, and no particular educational outcome is

guaranteed. *Id.* School districts are not obligated to provide a child with the best education,

public or private, that money can buy. *Steinberg v. Weast,* 132 F. Supp.2d 343 (D. Md. 2001).

Nor does the IDEA require a school district to maximize each child's potential to commensurate

with the opportunities provided to other children. *Rowley,* 458 U.S. at 198. Rather,

> The Act sets more modest goals: it emphasizes an appropriate, rather than an ideal
> education; it requires an adequate, rather than an optimal IEP. Appropriateness
> and adequacy are terms of moderation. It follows that, although an IEP must
> afford some educational benefit to the handicapped child, the benefit conferred
> need not reach the highest attainable level or even the level needed to maximize
> the child's potential.

*Id.* In *Doe v. Board. of Education of Tullahoma City Schools*, the Sixth Circuit analogized the

IDEA does not require the educational equivalent of a "Cadillac", but only requires the

equivalent of a "serviceable Chevrolet." 9 F.3d 455, 459-60 (6th Cir. 1993).

The burden of proof in an administrative hearing challenging an IEP is properly placed

on the party seeking relief. *Schaffer*, 546 U.S. at 62. The Panel found Parents could not meet

their burden and the evidence overwhelmingly supports this conclusion.

On June 14, 2005, Parents accepted the recommendation of Rechsteiner that G.A. had a

learning disability in reading comprehension. (DE-8-27). Jan Hall, a certified special education

teacher and special education coordinator who holds a master's degree, then prepared the IEP,

using the psychoeducational assessment, personal observation, and parental input as a basis, to

be considered at the IEP team meeting. (DE-8-29).

The team met on July 9, 2004 to discuss and modify the recommendations of Ms. Hall

and discuss and modify the accommodations and services needed for G.A. (*Id.*). The team

1823386/1

relied on multiple sources of information including information resulting from the evaluation and numerous tests and meetings that had occurred over the course of the school year, observations of G.A.'s teachers, State test results and accommodations, and parental input. The information reviewed by the team to draft G.A.'s IEP was reliable, current, and appropriate under Delaware regulations.[18] The IEP team believed the IEP addressed G.A.'s learning disability, and Parents voiced no disagreement. (T-84 (3/15/05)). Parents never suggested any additional goals or objectives to be made part of the IEP. (T-87-88 (3/15/05)).

Given G.A.'s difficulties, it is apparent the IEP targets G.A.'s needs in reading comprehension. The team universally agreed G.A. would benefit from a team room approach with a certified special education teacher, and such was written into her IEP. (DE-8-30). The IEP identified and provided services for reading comprehension including support from the resource teacher, direct instruction in reading strategies, use of story webs, small group instruction, teaching memory strategies and the use of neuronimpress methods. (*Id.*). Not only did the IEP address reading comprehension, but it also provided support and services for other areas of weakness, such as math reasoning, listening comprehension, auditory processing, anxiety, graphomotor skills, underdeveloped trunk muscles, seating and counseling. (*Id.*).

Importantly, measurable and defined goals for reading comprehension were shared at the meeting (DE-8-29) and incorporated into the IEP with benchmarks targeting the end of each marking period. (DE-8-30). Present levels of performance are listed for all her goals and objectives. (*Id.*) All goals in the IEP are stated in measurable terms and include short-term objectives which detail how G.A. would have reached her long-term goals. (*Id.*). Moreover, the IEP has one and a half pages of accommodations, modifications, supports and services G.A.

---

[18] When developing or revising a child's IEP, the IDEA regulations require the IEP team to consider the initial or most recent evaluation of the child. 34 C.F.R. § 300.346(a)(1).

would receive in the classroom based upon her particular needs. The accommodations, modifications, supports and services G.A. would receive address not only reading comprehension, but other areas of need as well. (*Id.*). To specifically assist with reading comprehension, she would receive many supports, including support from the resource teacher, direct instruction in reading strategies, the use of different strategies to improve her skills, and instruction concerning memory. (*Id.*) Equally important, the proposed IEP allows G.A. to benefit from small group instruction. (*Id.*).

Had G.A. stayed in the District, her special education teacher likely would have been Mrs. Hall, who, along with other of G.A.'s teachers, was certified in the Orton-Gillingham method. (T-141, 201 (2/15/05)). The Orton-Gillingham method is a highly structured, sequential multi-sensory approach to reading. (T-168-169 (5/24/07)). This is the type of approach appropriate for a student like G.A. who has reading comprehension issues. (T-186-187 (5/30/07)).

The minutes of the July 9, 2004 meeting do not indicate the mother objected to the IEP. (DE-8-29). At the 2005 hearing, Parents challenged an allegedly low student to therapist ratio. (T-172 (1/24/05)). However, the minutes of the July 9, 2004 meeting do not indicate the mother raised this issue at the IEP meeting. (DE-8-29). Regardless, a dispute over the number of therapists in a school is not an IEP issue, it is a placement issue, and everyone agreed G.A.'s placement in the team room at Lord Baltimore was proper. (DE-8-27).

The only logical conclusion is that G.A.'s IEP was calculated to meet her needs and contained goals and objectives in the areas of reading comprehension and other areas as well.[19]

---

[19] The thrust of the Parents' argument the IEP is inappropriate came from someone named Al Katz, who has no certifications in Delaware, is not a special education teacher, not a school psychologist, not a reading specialist, and not certified in Orton-Gillingham. (T-24 (3/17/05)).

1823386/1

The Panel agreed the IEP was reasonable, and G.A. would have received meaningful educational benefit from its implementation. (8/1/07 Panel decision at 24). The Panel found G.A. was going to be in a team classroom with a special education teacher in that room for 12.5 hours per week. (*Id.*) The Panel also found the IEP addressed her other needs. While it was a work in progress, the Panel found the working draft was a good start and G.A. could have received meaningful educational benefit from this plan as written. (*Id.*) Lastly, the Panel noted that if Parents wanted more from the District, they should have made their suggestions in a team meeting where the team could consider their suggestions. Ultimately, the Panel determined that the proposed IEP was reasonably calculated to provide meaningful educational benefit, and denied the requested relief. (8/1/07 Panel decision at 24-25). The overwhelming evidence supports the Panel's conclusion.

Perhaps anecdotally, it is noted that, at the 2005 hearing, St. Peter testified the mother told her a "major reason" the Parents did not accept the IEP was because the District would require G.A. to repeat the third grade (T-70 (3/15/05); T-34 (3/1705)) – not because Parents thought the IEP was inappropriate. Such pretext is yet another reason to affirm the Panel's decision.

## V.   BECAUSE THE IEP AND PLACEMENT WERE APPROPRIATE, THE PARENTS ARE NOT ENTITLED TO TUITION REIMBURSEMENT OR THE COSTS OF UNILATERAL PRIVATE PLACEMENT

The Parents would be entitled to tuition reimbursement for G.A.'s private placement at the LCS only if the Court determines: (1) G.A.'s educational program and placement in the District is inappropriate, *and* (2) her educational program and private residential placement at LCS is appropriate. *See Carter*, 501 U.S. at 15-16, quoting *Sch. Comm. of Burlington Dept. of Educ.*, 471 U.S. 359, 373-374 (1985); *Ridgewood,* 172 F.3d 238. It is the Parents' burden to

establish the appropriateness of the program and placement at LCS.  *Id.*  In *Oberti*, the Third Circuit makes clear the burden is on the party placing the child in the more restrictive placement to show the special education needs of the child can only be met in that placement.  995 F.2d 1204.  Because G.A.'s IEP and placement in the District's schools is appropriate, Parents are not entitled to the tuition reimbursement or the private placement they seek.

Consistent with the District's obligation to provide an educational program in the least restrictive environment and taking into consideration G.A.'s individual needs, the IEP team (including the mother) <u>unanimously</u> placed G.A. in the team room in the District.[20]  (DE-8-27).  The team considered this to be the least restrictive environment for G.A.  (T-84 (3/15/05)).  There is no evidence the District could not meet G.A.'s needs.

Even if the Court were to find the District's program or placement inappropriate to meet G.A.'s needs--despite Parents' agreement the placement was appropriate (DE-8-27)--Parents fail to establish the appropriateness of LCS.  Indeed, the Panel found evidence that G.A. was receiving <u>none</u> of the services at LCS that Parents were requesting the District to provide.  (T-13-21, 72-75 (3/15/05)).  The Parents can therefore not meet the burden under *Florence County*.

## VI.    THE UNREASONABLENESS OF PARENTS' CONDUCT IN THIS CASE WARRANTS A DENIAL OF RELIEF

The District has already established it timely engaged in Child Find and the IEP was appropriate.  Aside from these issues, relief can be denied or otherwise reduced if the Court finds Parents acted unreasonably.  *See*, 20 U.S.C.A. § 1412(a)(10)(C)(iii); 34 C.F.R. § 300.403(d).  In this case, Parents' conduct far exceeded the bounds of reasonableness.

---

[20] On appeal, Parents contend placement was predetermined before program development.  (D.I. 1, ¶ 36).  There is no evidence to support this conclusion.

1823386/1

To reward Parents' unreasonable conduct in this case would not serve the IDEA's underlying purpose of providing children with a free appropriate public education through the cooperation of school officials and parents. The Court cannot require anything more from the District than what it was obligated to provide by law. That obligation does not include private placement at LCS or the other relief the parents seek.

First, the District did what was best for G.A. despite the Parents' actions to the contrary. Indeed, the Parents battled the District at every point along the way. Warner thought the mother disrupted and interfered with G.A.'s education. (T-253 (5/24/07)). The disruption went beyond over-supplementing G.A. and having extensive unnecessary contact with G.A.'s teacher, both in school and at the teacher's home. As examples, the District attempted to provide G.A. with a program called Immersion in Learning, which would have benefited G.A. in the area of reading, but Parents took her out of the program. (DE-8-26; T-179-180 (5/30/07)).[21] The District offered summer school, which Parents also declined. (T-180 (5/24/07); PE-7-38). Most importantly, Parents refused to allow G.A. to continue to participate in the nationally recognized HOST (Help One Student to Succeed) program in December 2003. (T-155 (5/24/07)). HOST would have provided support to G.A. 4-5 times per week. (*Id.*).

Second, Parents repeatedly misled the District into believing they were satisfied with their child's education. Parents must not be permitted to act as if they were satisfied with the District's education of G.A., while all along planning to unilaterally send her to private school. The following salient facts compel this conclusion:

---

[21] Note the Parents stated in a May 28, 2004 letter they did not want G.A. in Immersion in Learning so she could spend more time in Mrs. Warner's class. Mrs. Warner is not a special education teacher. If the Parents contend the District should have been rendering special education services sooner, one must wonder why the Parents insisted G.A. spend more time with a general education teacher. (DE-8-26).

1.      Parents signed the June 13, 2003 registration form indicating G.A. had a 504 plan, but not indicating that she was in need of special education services. (DE-8-2).

2.      Parents signed the September 2003 meeting report without sharing a concern G.A. may need special education services. (DE-8-5).

3.      The October 15, 2003 conference notes reflect Parents' agreement with the District's decisions. (DE-8-9).

4.      The February 3, 2004 conference notes again indicate the Parents' agreement with the District's decisions. (DE-8-14).

5.      The March 3, 2004 conference notes again reflect the Parents' agreement with the District's decisions. (DE-8-18).

6.      Mother admitted in a meeting she recognized G.A. was "tremendously supplemented throughout the year." (DE-8-27, Parent IEP Input Form). If G.A. was tremendously supplemented, as the mother admits, one must wonder how the District failed to fulfill its Child Find obligation.

7.      Parents and their advocate all signed the June 14, 2004 meeting minutes indicating their agreement. (DE-8-27).

8.      Finally, as an equal member of the IEP team, Parents had an obligation to be straightforward with the District. They were not. In May, 2004, G.A. told Warner and Mrs. Lynch she would be attending LCS the next year. (T-263, 267 (1/20/05); T-56 (1/24/05)). On the basis of G.A.'s statements she would attend LCS in September, at the June 14, 2005 IEP meeting, the team asked Parents if they were going to enroll G.A. in LCS, and they did not respond. (DE-8-27; PE-7-43; T-63 (1/24/05)). Since the Parents had still not informed the District of their intentions for G.A. for the 2004-2005 school year, at the July 9, 2004 IEP

meeting the team asked Mother about Parents' intentions. Mother said they had not yet made a decision. (DE-8-29). On July 27, 2007, the Parents requested that G.A.'s records be sent to LCS. (T-181 (5/24/07)). On August 20, 2004, the District received a letter informing them Parents were removing G.A. from the District. They filed for due process September 1, 2004. (DE-8-1). Clearly, Parents were playing "hide the ball" with the District.

Parents are an equal part of the IEP team. (T-111 (5/24/07)). Indeed, the minutes of the July 9, 2004 meeting do not indicate the mother objected to the proposed IEP. (DE-8-29). Rather, the IEP presented was a draft and a "working document" subject to parental input. (T-129 (2/15/05)). Janet Hickman told the mother to contact her if she had any questions about the IEP, or if there was anything else that needed to be addressed. (T-209 (1/24/05)). There was no response from the Parents. The team felt there was a lack of closure because there was no meeting to try to address Parents' concerns. (T-96 (3/15/05)). If the Parents had concerns prior to the filing of the due process hearing request in August, 2004, they should have shared such concerns with the team, rather than baiting the District into preparing an IEP, while all along planning to send G.A. to a private school. This conduct is reprehensible, in bad faith, and must preclude any relief to Parents.

## VII.  DR. BUNTING MUST BE DISMISSED AS A DEFENDANT BECAUSE SHE WAS NOT YET HIRED BY THE DISTRICT AS THE SUPERINTENDENT WHEN G.A. WAS ENROLLED IN THE DISTRICT

Dr. Bunting was not hired by the District as the Superintendent until 2006. Consequently, there is no way that she could have violated G.A.'s rights, and she must be dismissed.

## VIII.   THE PANEL MADE NO ADVERSE EVIDENTIARY RULINGS RELEVANT TO PARENTS' CASE WHICH IMPLICATE FEDERAL RULES OF EVIDENCE 401 OR 702

On appeal, Parents allege the Panel misinterpreted Federal Rule of Evidence ("FRE") 401 and FRE 702 which impeded their ability to support their claim to a remedy. (D.I. 1, ¶ 40). The Panel made no evidentiary rulings adverse to Parents. Rather, they allowed Parents' evidence to be admitted subject to it being authenticated by a witness. The Panel decision makes this clear:

> The parents asserted that Exhibit Numbers P-6, P-7, and P-8 were submitted to support their proposed remedy. The panel allowed these documents to be entered into evidence believing that the author would be testifying about her recommendations. This witness was never presented. The panel allowed the remaining documents only to protect the parents' right to appeal but made it clear that the panel believed they were not relevant. No witnesses were presented to authenticate these documents. The panel raised this issue sua sponte after receiving the Parents' documentary evidence in an attempt to alert the parents about this problem as soon as possible

(8/1/07 Panel decision at 7) (emphasis added). Not only did Parents never call the witness who was expected to authenticate the documents, Parents abruptly passed on their opportunity to present evidence on the appropriate remedy. This was their strategic decision and they must live with it. *See F.D. ex rel. K.D. v. Holland Twp. Bd. of Educ.*, 2006 WL 2482574 (D.N.J., Aug. 25, 2006) (attached as Exhibit 2).

Furthermore, the evidence Parents proffered to prove their remedy was not probative of the remedy issue. One would expect evidence of a proposed remedy to include invoices, receipts and the like. To the contrary, Parents' evidence attempted to show G.A. continued having learning issues after leaving the District in the summer of 2004. This evidence had nothing to do with what the Panel should have ordered in the event they found a violation of Child Find, or that the IEP was inappropriate. Moreover, the case was on remand three years after the due process

hearing request was filed. Therefore, the issue of the remedy had to be considered at a snapshot in time when the due process hearing request was filed, considering only the evidence existing at the time of the filing. What happened after G.A. left the District was not relevant, temporally or practically. Lastly, because the Panel rightfully determined there was no Child Find violation and the IEP was appropriate, no remedy was due. Therefore, if the Panel made an evidentiary mistake concerning the remedy (which they did not, as they effectively did not preclude the admission of the proffered evidence), the issue is moot because there is no violation to remedy.

## IX.    GIVEN THE COMPLETE FAILURE OF THE IDEA CLAIMS, THE CLAIMS UNDER SECTION 504 CANNOT BE SUSTAINED

In addition to the IDEA claim, Parents purport to assert allegations under Section 504 of the Rehabilitation Act. The District's provision of a Free and Appropriate Education ("FAPE") satisfies its obligations under Section 504 as well. *Ridgewood*, 172 F.3d 238.

## X.    NO RELIEF IS DUE BECAUSE THERE WAS NO DEPRIVATION OF FAPE

The appeal requests "monetary compensatory education," tuition, costs and private education. Each of the requests is premised on the Parents' argument the District denied G.A. FAPE. As detailed above, G.A. was not denied FAPE, because the District timely engaged in Child Find, and the IEP was appropriate. Accordingly, there is no reason to order compensatory education for G.A., private school tuition assistance, or any of the other remedies Parents seek.

"Compensatory monetary education" is a term foreign to IDEA practice. It is assumed that Parents seek "compensatory education." "Compensatory education" is a form of equitable relief available under the IDEA to remedy a past denial of FAPE. *Burlington,* 471 U.S. 359. It is available when an educational agency knows, or should know, that a student's IEP is inappropriate, or that the student has received only minimal benefit from his program and fails to correct the deficiencies in the programming. *M.C.. v. Central Reg'l Sch. Dist.*, 81 F.3d 389, 397

(3d Cir. 1996). Compensatory education is not required for every deficit in a student's program. It is generally available only where there has been "a gross or prolonged deprivation of the right to a free appropriate education." *Carlisle Area School District v. Scott P.*, 62 F.3d 520, 537 (3d Cir. 1995).

As the Panel determined, G.A. was timely identified and her IEP was appropriate. As a result, no compensatory education services are due as a matter of law. *Burlington,* 471 U.S. 359. There is simply no educational deprivation for which to compensate, much less a "gross or prolonged deprivation." Indeed, G.A. was only in the District for one year, and was making good progress for at least the first half of the year. To the extent she should have been identified sooner by a few weeks, a premise the overwhelming evidence in the case refutes, there is no credible argument that she should have been evaluated or identified sooner than February, 2004. The IEP was certainly not "grossly" inappropriate. Indeed, as the Panel determined, it was reasonably calculated to provide meaningful educational benefit to G.A. Clearly, there can be no "prolonged deprivation" with respect to the IEP because G.A. was removed from the District by her parents before it was implemented.

The overwhelming evidence shows no relief should be granted. However, if compensatory education is due, the right to it does not accrue until a district knows, or should know, that the programming is not working; the amount of compensatory education is limited to the length of the deprivation, reduced by a reasonable amount of time for the district to correct the program once it became aware of the deficiency. *Central Reg'l*, 81 F.3d at 397. Perfection is not necessary: the school district "may not be able to act immediately to correct an inappropriate IEP; it may require some time to respond to a complex problem." *Id.* Compensatory education awards should be adjusted accordingly. *Id.*

The Panel found no deficit in G.A.'s program that justifies compensation. There was simply no basis in the evidentiary record justifying G.A.'s placement in a private school or private tutoring at public expense. Nor have the Parents met their burden of demonstrating that G.A. requires a private school to remedy the problems they perceive with G.A.'s program. To the contrary, there is no testimony from anyone familiar with G.A. in the relevant time period opining that private placement or third-party services were necessary.

Finally, there is nothing in the District's conduct that justifies a publicly funded private education for G.A. Rather, the record amply demonstrates exceptional efforts by the District to meet G.A.'s needs. G.A. was not denied a free appropriate public education despite Parents' shifting of gears and their now overt animosity to District personnel and teachers, and despite Parents' change of heart concerning G.A.'s education. The District's demonstrated willingness and ability to successfully program for G.A. despite these factors weigh heavily in favor of denying relief.

## XI.  ATTORNEYS FEES ARE NOT AVAILABLE BECAUSE PARENTS DID NOT HAVE AN ATTORNEY

The claim for attorneys fees (D.I. 1, request for relief (e)) is incredulous because the Parents acted pro se.

## XII.  THE CLAIMS UNDER 42 U.S.C.A. § 1983 MUST BE DISMISSED BECAUSE VIOLATIONS OF SECTION 504 AND THE IDEA CANNOT GIVE RISE TO A CAUSE OF ACTION UNDER SECTION 1983

Parents allege a violation of 42 U.S.C.A. §1983 (D.I. 1). As a matter of law, this claim must be dismissed. *See A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 803, 806 (3d Cir. 2007) (holding that "Congress did not intend § 1983 to be available to remedy violations of the IDEA" and that "§ 1983 is not available to provide a remedy for defendants' alleged violations of [a student's] rights under Section 504").

39

## CONCLUSION

For the forgoing reasons the Defendants request the Court grant their Motion for Summary Judgment.

MORRIS JAMES LLP

_____
David H. Williams (#616)
dwilliams@morrisjames.com
James H. McMackin, III (#4284)
jmcmackin@morrisjames.com
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE  19899
(302) 888-6900/5849
Attorneys for Defendants

Dated:  August 20, 2008

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

WILLIAM and MAUREEN ANELLO,   )
                                  )

        Plaintiffs,          )

                                  )

        v.                 )      C.A. No. 07-668 LPS

                                  )

INDIAN RIVER SCHOOL DISTRICT   )
and SUSAN S. BUNTING,           )

                                  )

        Defendants.       )

## CERTIFICATE OF ELECTRONIC SERVICE

I, James H. McMackin, III hereby certify that on August 20, 2008, I electronically filed the attached **DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using CM/ECF, and that I have mailed by United States Postal Service the document to the following non-registered participants:

> William Anello
> 362 Alba Court
> West Grove, PA  19390
>
> Maureen Anello
> 362 Alba Court
> West Grove, PA  19390

                              */s/ James H. McMackin*
                              David H. Williams (#616)
                              dwilliams@morrisjames.com
                              James H. McMackin, III (#4284)
                              jmcmackin@morrisjames.com
                              MORRIS JAMES LLP
                              500 Delaware Avenue, Suite 1500
                              P.O. Box 2306
                              Wilmington, DE 19899
                              (302) 888-6900/5849

Dated:  August 20, 2008           Attorneys for Defendants

# EXHIBIT 2

<KeyCite History>

Only the Westlaw citation is currently available.

United States District Court,
D. New Jersey.

**F.D., S.D., on behalf of minor child, K.D., et. al., Plaintiffs,**
v.
**HOLLAND TOWNSHIP BOARD OF EDUCATION, Defendants.**

**Civil Action No.:05-5237 (AET).**

Aug. 25, 2006.

Staci J. Greenwald, Sussan & Greenwald, Esqs., East Brunswick, NJ, for Plaintiffs.

John E. Collins, Parker McCay P.A., Lawrenceville, NJ, for Defendants.

OPINION AND ORDER

BONGIOVANNI, Magistrate Judge.

**\*1** This matter comes before the Court on Motion by Stacy Greenwald, Esq., attorney for Plaintiffs F.D. and S.D. on behalf of their minor child K.D. (hereinafter "Plaintiffs") seeking to introduce additional evidence in the appeal of the Hon. John R. Tassini's, Administrative Law Judge, decision denying Plaintiffs' tuition reimbursement under the Individuals with Disabilities Education Act (hereinafter "IDEA"), 20 U.S.C. § 1415(i)(2006). Defendant, Holland Township Board of Education (hereinafter "Defendant" or "BOE") opposes said Motion. Following oral argument regarding the admission of the additional evidence and for the reasons set forth below, the Motion to Introduce Additional Evidence is DENIED.

I. FACTUAL AND PROCEDURAL BACKGROUND [FN1]

> FN1. The following facts are taken from Judge Tassini's Opinion of October 6, 2005, with supplementation provided in the parties' briefs to this Court. Referencing Judge Tassini's factual findings does not constitute an adoption of those findings.

K.D. was born on April 20, 1991, and possesses superior intelligence, but also suffers a language-based learning disability, attention deficit disorder, and auditory processing deficits. (ALJ Opinion at 4). In kindergarten, K.D. was classified as perceptually impaired, which enabled her to receive special education and related services. Id. In August 2003, following seven years of special education in the public school, Plaintiffs unilaterally withdrew K.D. from her Individualized Education Program (hereinafter "IEP") in the public school and placed her in the seventh grade at the private Cambridge School. Id. at 17. On February 18, 2004, Plaintiffs' attorney:

> notified the [Defendant] of their claim that the [Defendant] should pay for placement in the private school, 'commencing immediately and continuing for so long as the placement remains appropriate.' By letter dated February 25, 2004, the [Defendant] denied the request, noting that the parties had agreed to an IEP providing for placement in the public school system and that the Department of Education had not approved the Cambridge School for placement of educationally disabled students. Id.

In sum, Plaintiffs "demanded that the [Defendant] pay the private school's tuition and the [Defendant] denied responsibility for the claim." Id. at 3. Consequently, on August 16, 2004, Plaintiffs filed a request for a due process hearing with the Department of Education, Office of Special Education Services. Id. Shortly thereafter, administrative hearings were held on February 15 and 16, April 12, and May 20, 2005. Id.

During the administrative hearings, Plaintiffs reserved "the right to call any employee from the Cambridge School." (Def. Br. at 8 (quoting Plaintiffs' Amended Joint Discovery Plan (May 23, 2006)). During the hearing on April 12, 2005, Plaintiffs' attorney announced she had "scheduled a representative from the Cambridge School" to testify on May 20, 2005. Id. (quoting Administrative Law Transcript of April 12, 2005). However, Plaintiffs failed to call any representatives from the Cambridge School to describe the educational program provided to K.D. on the scheduled date. (ALJ Opinion at 18). Plaintiffs rested their case having called three witnesses to testify: Mrs. D., K.D.'s mother; Dr. David Henley, Ph.D., a psychologist who had provided counseling and art

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



therapy to K.D. since approximately November 2001; and Dr. Frank Ferrise, Psy.D., one of K.D.'s treating school psychologists with many years of experience in testing and counseling school children. Mrs. D. testified that K.D. learned to read and do homework by herself at Cambridge. She also testified that Cambridge School does not give grades and students pass according to "levels". Id. at 17. Mrs. D. further testified that K.D. was a happier child at Cambridge and that "a happy state of mind is conducive to educational progress." Id. at 20. Dr. Henley testified that he had seen the Cambridge School's promotional materials, knew of other children placed there, and approved of K.D.'s placement in the Cambridge School. However, he never visited the Cambridge School. Id. Dr. Ferrise testified that a smaller special education environment would be more supportive and helpful to K.D. with respect to her special needs. Id. at 12-13. Dr. Ferrise "candidly testified that he had 'heard' that the Cambridge School offered appropriate services" but could not attest to the appropriateness of that school. Id. at 20.

*2 Thereafter, on October 6, 2005, Judge Tassini found:

> Placement in the Board of Education's public school environment prevented her from progressing appropriately, and she required out-of-district placement. Nonetheless, petitioners agreed to an IEP that continued her placement in the [Defendant's] public school system for the 2003-2004 school year.... In any event, the petitioners did not present sufficient competent and credible evidence that the Cambridge School provided an appropriate education program and services.... The [Defendant] should not be ordered to pay for the cost of the private school placement.

Id. at 15-16, 20.

The parties then requested transcripts of the hearing and also requested an opportunity to submit written briefs. Judge Tassini granted the requests, and briefs were submitted by the parties on September 2, 2005. Id. at 3. Shortly thereafter, Plaintiffs' attorney submitted a letter stating she believed she would admit three exhibits consisting of records from the Cambridge School. Id. The Defendant objected to these exhibits as Plaintiffs "had called no witness from the Cambridge School to provide a foundation sufficient for admission of

that school's records or to otherwise describe the education and services it provided for K.D...." Id. at 4. On September 26, 2005, during a telephone conference with Judge Tassini, Plaintiffs' attorney withdrew the motion for admission of Cambridge records into evidence. Id.

Plaintiffs appealed the decision of the Administrative Law Judge to the district court pursuant to 20 U.S.C. § 1415(i)(2)(B). They now seek to offer expert testimony attesting to the appropriateness of the Cambridge School in order to obtain tuition reimbursement from February 28, 2004, through the end of K.D.'s 2005 school year.

## II. STANDARD OF REVIEW

The Individuals with Disabilities Educational Act (IDEA) "is a Spending Clause statute that seeks to ensure that 'all children with disabilities have available to them a free and appropriate public education." ' Schaffer v. Weast, 546 U.S. 49, 126 S.Ct. 528, 528, 163 L.Ed.2d 387 (2005). Congress's goal in enacting the IDEA "seems to be the assurance of access to special education services for children with disabilities." Susan N. v. Wilson Sch. Dist., 70 F.3d 751, 761 (3d Cir.1996). The IDEA requires that states receiving federal funds under this Act must ensure that a free and appropriate education (hereinafter "FAPE") "is available to all children with disabilities." 20 U.S.C. § 1412(a)(4)(2006). The public school must create an Individualized Educational Program (IEP) for each child and if the parents believe their child's IEP is inappropriate, they may request an administrative "impartial due process hearing." 20 U.S.C. § 1415(f)(2006). Prior to these administrative hearings, "the parties must disclose evaluations and recommendations that they intend to rely upon. 20 U.S.C. § 1415(f)(2). IDEA hearings are deliberately informal and intended to give ALJs the flexibility that they need to ensure that each side can fairly present its evidence." Schaffer, 126 S.Ct. at 536.

*3 When deciding an IDEA case, the District Court applies a modified de novo review. S.H. v. State-Operated Sch. Dist. of the City of Newark, 336 F.3d 260, 270 (3d Cir.2003). Federal courts do not have a particularized expertise in educational policy and should give due weight to the administrative proceedings. Hendrick Hudson Bd. of

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
(Cite as: 2006 WL 2482574, *3 (D.N.J.))

Page  45

Educ. v. Rowley, 458 U.S. 176, 206-07 (1982). However, when engaging in judicial review under the IDEA, the court may hear additional evidence not offered at the administrative hearing. 20 U.S.C. § 1415(i)(2)(B). Courts have defined "additional" in the ordinary sense, meaning supplemental. See Perrin v. United States, 444 U.S. 37, 44 (1980); see also Burlington v. Dep't. of Educ., 736 F.2d 773, 790 (1st Cir.1984).

The decision whether to admit or exclude additional evidence in an IDEA judicial review proceeding is within the sound discretion of the trial court. Susan N., 70 F.3d at 760. The threshold inquiry is whether the proffered additional evidence will assist the court in ascertaining whether Congress' goal has been and is being reached for the child involved. Id. "While a district court may exclude additional evidence, a court must exercise particularized discretion in its rulings so that it will consider evidence relevant, non-cumulative, and useful in determining whether Congress's goal has been reached for the child involved." Id. Thus construed, the additional evidence must not simply repeat or embellish evidence provided at the administrative proceeding. Id. at 762.

When determining whether additional evidence may be permitted courts have considered a number of factors, including but not limited to the following:
Whether the existence of a procedural bar prevented the introduction of the proffered evidence below, such as a limitation period or a restriction on the number of witnesses. See Monticello Sch. Dist. No. 25 v. George L., 102 F.3d 895, 901-02 (7th Cir.1996);
Whether the evidence was deliberately withheld at the administrative level for strategic reasons. See Roland M. v. Concord Sch. Comm., 910 F.2d 983, 998 (1st Cir.1990);
Whether the introduction of the additional evidence at the district court level would be prejudicial to the other party, i.e. if the additional evidence would interfere with the adverse party's ability to rebut it; and
The potential impact on the administration of justice, i.e. does the party seek to introduce a new theory under which it will be entitled to relief. Courts have construed the word "additional" as used in the IDEA as "supplemental." Susan N., 70 F.3d at 759. In that regard, a party should not be

permitted to introduce evidence unrelated to a legal theory presented at the prior hearing.
Antoine M. v. Chester Upland Sch. Dist., 420 F.Supp.2d 396, 403 (E.D.Pa.2006).

Additional or supplemental evidence should be used to fill gaps in the "administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing." Burlington, 736 F.2d at 790. The court in Burlington also noted that a valid reason for not presenting expert testimony during the administrative hearing could be the costliness of expert witnesses. Id. at 791. However, the First Circuit warned that in ruling on an additional evidence motion, "a court should weigh heavily the important concerns of not allowing a party to undercut the statutory role of administrative expertise, the unfairness involved in one party's reserving its best evidence for trial, the reason the witness did not testify at the administrative hearing, and the conservation of judicial resources." Id. at 791. Courts cannot "grant carte blanche to a party to introduce evidence that was not offered at the administrative hearing, and thus render the administrative proceedings a mere formality." Antoine v. Chester Sch. Dist., 420 F.Supp.2d at 403.

*4 Overall, in evaluating the additional evidence, the court, in its discretion, must respect the cooperative federalism of the IDEA while considering evidence that is relevant, cumulative, and useful. Id. "To negotiate these principles, a court should make an individualized assessment of the offered evidence, and determine whether the party offering the evidence has a valid reason for not introducing it below. Id.

A. The Proffered Additional Testimony Is Impermissible After-Acquired Evidence.

This Court finds that the proposed additional evidence to show the appropriateness of the Cambridge School was available and should have been proffered during the administrative law hearing. The court in Susan N. noted that after-acquired evidence that was potentially available to a plaintiff when the school district made its decision is excludable. 70 F.3d at 762. "Neither [20 U.S.C. §

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d

(Cite as: 2006 WL 2482574, *4 (D.N.J.))

1415(i)(2)(B) ] nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of a child's placement." Id. (citing Fuhrmann v. East Hanover Bd. of Educ ., 993 F.2d 1031, 1040 (3d Cir.1993). Although the Court in Susan N. cautioned "a more liberal approach might be appropriate in a case involving a claim for remedial education relief," as opposed to an approach taken in a damages action, it nonetheless held that after-acquired evidence "should be used by courts only in assessing the reasonableness of the [school] district's initial decisions regarding a particular IEP or the provision of special education services at all." Id.

Plaintiffs seek to introduce the testimony of two expert witnesses as representatives of Cambridge School, either the Director, Deborah Peters, or one of K.D.'s teachers and an independent expert witness, Dr. Carole Aitchison. The witness from Cambridge will likely:

> submit a report and testify if required regarding the Cambridge program, the Cambridge School curriculum, the scope and sequence of instruction, the credentials of the teachers, the number of students that attend Cambridge, the types of students that attend Cambridge, [how specialized language instruction is incorporated], their evaluation of K.D. and her educational needs, her functioning level when she first entered the Cambridge School ... and her functioning at the time of graduation. The individuals will also testify regarding K.D.'s progress and how Cambridge was able to remediate K.D.'s differences and enable her to learn.

(Pl.'s Letter Describing Evidence, p. 1 (June 30, 2006)). Whereas, Dr. Aitchison would testify to "K.D.'s educational records, including her IEP's and educational testing.... [H]er observation at the Cambridge School, review of K.D.'s work samples from the Cambridge School, testing completed at the Cambridge School ... credentials of teachers at the Cambridge School and why the Cambridge School was appropriate to meet K.D.'s educational needs." Id. at 1-2.

*5 The now proposed evidence concerning Cambridge's programs, curriculums, teacher qualifications, and K.D.'s progress was available on May 20, 2005. Plaintiffs scheduled a Cambridge representative to attest to the Cambridge School's appropriateness on May 20, K.D.'s second-to-last

month at Cambridge. Plaintiffs' witness was never called on May 20 because: (1) they were "not available", (2) Plaintiffs "tried to keep the cost of the proceeding down" and (3) Plaintiffs believed they would prevail without presenting evidence regarding the Cambridge School. (Oral Arg. at 16-17). Furthermore, Plaintiffs' scheduling of a witness supports the conclusion that such evidence was in fact available on May 20, 2005.

The proffered testimony was "acquired" after the administrative hearing for purposes of its admissibility. After-acquired evidence is only admissible as additional evidence to determine the reasonableness of the original IEP. The ALJ ruled that Defendant's IEP was inappropriate. Moreover, the proffered evidence relates directly to the appropriateness of K.D.'s placement of the Cambridge School, not Defendant's IEP. The proffered additional evidence is therefore inadmissible.

B.  Plaintiffs Failed to Provide Sufficient Justification for Not Proffering the Evidence at the Administrative Hearing.

Plaintiffs did not provide a "sufficient justification" for not proffering the evidence during the administrative hearing and this Court will not permit its introduction now. The Antoine factors discussed above indicate instances which constitute sufficient justifications for not proffering the evidence earlier.

The first is the existence of a procedural bar which might have prevented the evidence from being proffered during the administrative hearing. Antoine, 420 F.Supp.2d at 403. A procedural bar might be a limitations period or a restriction on the number of witnesses imposed by the ALJ. Id. In the current matter, Plaintiffs conceded that there was no procedural bar that prevented them from proffering the evidence during the ALJ hearing which they now offer to this Court. (Oral Arg. at 17-18). Although Plaintiffs' witness was unavailable on the May 20 hearing date which had been agreed upon, nothing prevented Plaintiffs from asking for an adjournment to reschedule the hearing date or to ask for an additional hearing. Id. Plaintiffs were aware they did not have anyone from Cambridge testify during the hearing and yet never raised this as an issue to the ALJ. Id. Furthermore, Plaintiff's had reserved

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



the right to call "any employee of the Cambridge School" and could have called any other teacher or knowledgeable person from Cambridge who could have testified in place of the unavailable witness but did not do so.

Additionally, at the close of the hearing and upon request of the parties, the administrative proceedings were supplemented in writing and Plaintiffs sought to submit three exhibits consisting of K.D.'s progress reports from Cambridge. Id. at 16. Defendant objected to these exhibits as the parties had previously agreed they would not object "to marking any of the exhibits as joint exhibits, so long as there was going to be somebody to testify regarding the exhibits," Id. Before the ALJ could rule on Defendant's objection, Plaintiffs withdrew the exhibits. (ALJ Hearing at 4). Plaintiffs further acknowledged that the ALJ did nothing to prevent Plaintiffs from arguing about whether or not they could rely on these exhibits. (Oral Arg. at 17). "IDEA hearings are deliberately informal ... to ensure that each side can fairly present its evidence." Schaffer, 126 S.Ct. at 536. Despite two opportunities, the Plaintiffs failed to call a witness from the Cambridge School, and withdrew their exhibits. Thus, the Court finds no procedural bar which may have prevented the evidence from being proffered during the administrative hearing.

**\*6** The second factor of Antoine directs the court to consider whether the proposed additional evidence was deliberately withheld from the administrative hearing for strategic reasons. Antoine, 420 F.Supp.2d at 403, (quoting Roland M. v. Concord Sch. Comm., 910 F.2d 983, 998 (1st Cir.1990)). Plaintiffs intentionally withheld the testimony of a Cambridge representative due to time management issues, cost issues, and because Plaintiffs "had tried cases similar to this where nobody from the actual school had testified" where they were successful based on such limited evidence. (Oral Arg. at 16-18). Proof of the Cambridge School's appropriateness is necessary to receive reimbursement and evidence regarding Cambridge's appropriateness could have been presented. A party should not be able to call additional witnesses who were previously available when strategically, they thought they had presented enough evidence to prevail. Plaintiffs deliberately withheld this evidence for strategic reasons, and were this Court to allow such evidence to be introduced, it would eviscerate

the authority of the administrative hearing.

The third factor of Antoine considers whether the additional evidence would be prejudicial to the adversary. Antoine, 420 F.Supp.2d at 403. Currently, Defendant claims it will be prejudiced by the introduction of Dr. Aitchison's export report as the doctor was neither identified as a potential witness nor will Defendant have an opportunity to refute the testimony because K.D. graduated from the Cambridge School in approximately June, 2005. "The [Defendant] can't go to that school and observe her program in order to see if what Dr. Aitchison says is true and correct. Parenthetically, Dr. Aitchison is not going to be able to make that kind of a visit either ..." (Oral Arg. at 28). Plaintiffs counter that Defendant had "ample opportunity" to observe K.D.'s placement in Cambridge. Id. at 31. However, prior to the ALJ hearings, "the parties must disclose evaluations and recommendations they intend to rely upon. 20 U.S.C. § 1415(f)(2) ..." Schaffer, 126 S.Ct. at 536. Had Defendant been aware of Dr. Aitchison's testimony, they might have responded and prepared differently. Moreover, Defendant is placed at a significant disadvantage because they are unable to observe K.D. at the Cambridge School. Thus, this Court precludes Dr. Aitchison's expert report and testimony as it would prejudice Defendant by placing Defendant in a disadvantageous position regarding their ability to refute Dr. Aitchison's expert report.

The final factor that Antoine addresses when a party does not proffer additional evidence at the administrative level is "the potential impact on the administration of justice," such as attempting to introduce a new legal theory unrelated to what was presented previously which would entitle that party to relief. Antoine, 420 F.Supp.2d at 403. While Plaintiffs do not attempt to present a new legal theory, they do attempt to introduce new evidence that was rarely referenced during the ALJ hearings. Plaintiffs conceded that during the ALJ hearings they were not only apprised of but also litigated the action as if they had the burden of proving the Cambridge School's appropriateness, yet Plaintiffs chose not to offer the testimony of anyone from Cambridge. (Oral Arg. at 11).

**\*7** Plaintiffs proffered three witnesses to prove Cambridge's appropriateness. None of these

(C) 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d
**(Cite as: 2006 WL 2482574, *7 (D.N.J.))**

Page  48

witnesses, however, had any connection or relation to the Cambridge School, its curriculum, its teachers, and foremost K.D.'s functioning at the school. Plaintiffs' first expert witness, Dr. Henley, "has nothing to do with the Cambridge School.... He was her therapist.  And testified that her placement at the Cambridge School was appropriate." Id. at 10. Dr. Henley has seen the Cambridge School's promotional materials but has never visited the School. (ALJ Opinion at 20). Dr. Ferrise, the second expert that testified on behalf of Plaintiffs, "outlined what the parameters of an appropriate program should look like ... and mentioned all of the things that were being provided to [K.D. at the Cambridge School]." (Oral Arg. at 16).  However, Dr. Ferrise "candidly testified that he had 'heard' that the Cambridge School offered appropriate services" but could not attest to the appropriateness of that school. (ALJ Opinion at 20). Plaintiffs now seek to introduce the testimony of a Cambridge School employee, and while it is not a new legal theory, it would "impact the administration of justice" in that it would alter this "modified trial de novo" into a completely new trial with new experts and justifications for K.D.'s placement, which thus renders the administrative proceeding a mere formality.

C. The Purported Shifting of the Burden of Proof Has No Bearing on Plaintiffs' Case.

Plaintiffs also contend that the Court should grant them leave to expand the administrative record pursuant to the United States Supreme Court's decision in Schaffer, 126 S.Ct. 528 (2005), which held that the party challenging an IEP bears the burden of proof. "The burden of proof in an administrative hearing challenging an IEP is properly placed on the party seeking relief." Id. at 537.

Plaintiff is correct that the burden of proving the appropriateness of the IEP has shifted following Schaffer. Previously, the law in New Jersey was that the school district always carried the burden of proving the appropriateness on the IEP. See Lascari v. Bd. of Educ., 116 N.J. 30 (1989). The Supreme Court in Schaffer, which involved a challenge to the school district's IEP, expressly stated, "[w]e hold no more than we hold to resolve the case at hand: The burden of proof in an administrative hearing challenging an IEP is properly placed on the party

seeking relief." 126 S.Ct. at 537. Plaintiffs had the burden of proving the Cambridge School was appropriate before Schaffer and the Supreme Court's decision did not change this.

IV. CONCLUSION

For the foregoing reasons, it is on this 25th day of August, 2006, hereby ORDERED that Plaintiff's to Expand the Administrative Record is DENIED.

2006 WL 2482574 (D.N.J.)

END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.