# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| WILLIAM and MAUREEN ANELLO, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 07-668 LPS |
| | ) | |
| INDIAN RIVER SCHOOL DISTRICT | ) | |
| and SUSAN S. BUNTING, | ) | |
| | ) | |
| Defendants. | ) | |

### EXHIBIT NO. 1 TO
### DEFENDANTS' OPENING BRIEF IN SUPPORT OF
### THEIR MOTION FOR SUMMARY JUDGMENT

### (REDACTED)

IN THE FAMILY COURT OF THE STATE OF DELAWARE

IN AND FOR SUSSEX COUNTY

William and Maureen ███[1],          :          File No.  CS05-02707
                                      :
              Petitioners,            :          Petition No.  05-32107
                                      :
      v.                              :
                                      :
Indian River School District,         :
                                      :          PETITION TO APPEAL DUE
              Respondent.             :          PROCESS DECISION

### ORDER

On September 1, 2004 William and Maureen ███ ("parents") filed a compliant requesting a due process hearing against Indian River School District ("IRSD" or the "district").  The complaint was filed on behalf of their nine-year-old daughter, ███, who had been a third grade student in the district during the 2003-2004 school year.  The parents' complaint set forth that in June 2003, the parents met with a school official to discuss their daughter's learning disabilities; that in October 2003 the parents met with other school officials to review ███s 504 Plan which, in part, addressed ███'s auditory issue; that in March 2004 private evaluations of ███ obtained by the parents were provided to district officials and, subsequently on July 9, 2004, the district proposed an Individualized Education Plan ("IEP") for ███.  The complaint also sets forth several questions raised by the parents regarding the implementation of the proposed IEP.    In their complaint the parents request to be reimbursed for past

---

[1] This Court has listed both William and Maureen ███ as petitioners since the administrative complaint was filed by both parents.  The parents filed the complaint on their child's behalf, but for simplicity's sake the Court makes no distinction between the child's rights and interests and the parents' rights and interests.

occupational therapy, private tutoring, services from Sylvan Learning Center, tuition at a private school, and future occupational therapy.

The hearing panel denied the parents' request. The parents in this appeal alleged the Due Process Hearing Panel ("panel") (1) committed reversible error by prohibiting parents from presenting any evidence on the issue of the district's failure to timely determine ███ to be a special needs child for the school year 2003-2004 and (2) that the panel erred in finding the district had provided ███ an appropriate IEP.[2]

After reviewing the record, I am satisfied that the parents' complaint met the minimal pleading standard applicable to the Individuals with Disabilities in Education Act ("IDEA") complaints, and the district was on notice that the parents were raising a "child find" issue for the 2003-2004 school year. The panel committed reversible error in not permitting the parents to present evidence on the issue of "child find" and in dismissing their "child find" claim. I am also satisfied that the panel wrongfully focused on the parents' withdrawal of ███ from the district when ruling on whether the district provided ███ with an appropriate IEP for the 2004-2005 school year. The parents were entitled to remove ███ from the district and then later litigate the appropriateness of the IEP without first providing the district with an opportunity to implement it.

Therefore, the panel's decision is reversed, and this case is remanded to a due process educational panel for the purpose of determining if the district timely identified

---

[2] The panel's decision, holding that "it can <u>not</u> find that the district failed to provide the student with FAPE [a free appropriate public education] or that it did not provide the student with an appropriate IEP" does not designate which school year(s) are covered. See 20 U.S.C.A. §1412 which states "a free appropriate public education is available to all children with disabilities residing in the state." It appears that ███ would have been offered an IEP by the district for the 2004-2005 school year had she continued her education at the Indian River School District. The appropriateness of the IEP will be addressed later.

███ as a special needs student and, if not, to determine a remedy, if so warranted. On remand, the due process educational panel shall also determine whether the district provided ███ with an appropriate IEP, and, if not, shall determine a remedy if so warranted.

### Factual and Procedural Background

Before enrolling in the IRSD, ███ attended public school in White Plains, New York, where she received classroom accommodations under a 504 Plan.[3]   In September 2003, ███ began her third grade year in the IRSD in Connie Warner's third grade classroom.

On September 22, 2003, the district held an initial 504 conference which the parents and members of the Instructional Support Team attended.[4]  At this meeting, it was decided that ███ would remain on a 504 Plan and continue to receive classroom accommodations at IRSD as she did at her school in New York, although the new 504

---

[3] Section 504 is a civil rights law and its purpose is to protect individuals with disabilities from discrimination for reasons related to their disabilities. Under Section 504, the child with a disability may receive accommodations and modification that are not available to children who are not disabled.  These accommodations and modifications are also available under the IDEA but, unlike the IDEA, Section 504 does not ensure that a child with a disability will receive an individualized education program that is designed to meet the child's unique needs and provide the child with educational benefit. *See Wrightslaw, From Emotions to Advocacy, the Special Education Survival Guide* by Pam and Pete Wright, Harbor House Law Press, Inc. (2002).
[4] The Instructional Support Team (referred to as IST during the administrative hearing) consisted of the following members: Debra Keiper (the 504 Coordinator), Connie Warner (███ regular education teacher), and Mary Cannon (the school nurse). *See* Parent's Evidence, Tab 18, signatures on page 2.

plan did not contain some of the accommodations contained in the New York plan.[5] The significance of the New York 504 plan will not be addressed here because of the remand. The New York plan should be of interest on remand since the parents argued at the due process hearing and presumably will do so at the new hearing that ██████ was not properly evaluated in September 2003. This will be a proper inquiry on remand. The parents requested at this meeting an occupational therapy ("OT") evaluation[6] for their daughter and this test was performed on September 25, 2003.

On October 15, 2003, another 504 conference was held and Mrs. ██████ attended this meeting. The Instructional Support Team ("IST") discussed ██████'s OT evaluation. The OT evaluation was performed by Eleanor Gregory who wrote the following "summary of results:"

> ██████ did very well in fine motor skills (age appropriate dexterity and in-hand manipulations of pennies, pegs, and beads.) Her handwriting skills are a bit large for her grade level, but she is printing on the speed of a 5th grade level. She did, however, score low on the visual-perceptual evaluation. These scores are altered by her scanning skills (need to look fully across the page before choosing an answer) and her impulsive answers. She has benefited from highly skilled OT intervention from her previous school. Skilled intervention on a pullout basis is not indicated at

---

[5] *See generally* Parents' Evidence, Tab 18. These 504 accommodations included the following:
   (1) Under the category of "Modifying the Presentation of Material": break assignments into segments of shorter tasks, and monitor the student's comprehension of language used during instruction.
   (2) Under the category of "Modifying the Environment": use preferential seating.
   (3) Under the category of "Modifying Time Demands": increase time allowed for completion of tests or increase time allowed for completion of test or assignments and consistently follow a specific routine.
   (4) Under the category of "Modifying Materials," subcategory "Visual Motor Integration and Written Expression Problems": allow student to use either cursive or manuscript and avoid pressures of speed and accuracy. Under subcategory "Visual Processing Problems": avoid crowded, cluttered worksheets by utilizing techniques such as blocking, cutting, and place marker. Under subcategory "Language Processing Problems": slow the rate of presentations, paraphrase information, encourage feedback from student to check for understanding, alert student's attention before expressing key points, and repeat directions.
   (5) Under category "Helping Focus Attention": seat student close to teacher.
   (6) Under category "Assisting the Reluctant Starter": Check for student understanding of instructions.
[6] An OT evaluation measures visual-motor perception and sensory awareness (including tactile and vestibular) skills. *See* Parents' Evidence, Tab 18, page 14 which is the parent's request for an OT evaluation.

this time. She can remain on a consultative basis if the teaching staff feels that it is indicated.[7]

The IST ultimately decided that the OT evaluator would consult with Ms. Warner on an as-needed basis up to two times per month. Ms. Warner testified she never saw a need to contact the OT therapist during the school year. Ms. Warner was to continue implementing the 504 Plan and was to alert Debra Keiper, the school reading specialist, if ███s grades did not improve by the end of the first marking period.

During the later half of the first marking period, the district recommended to the parents that ███ receive out of school tutoring. The parents enrolled ███ in the Sylvan Learning Center. In addition, the parents employed a high school student to provide extra tutoring once a week.[8] ███s first marking period report card showed that she scored 70 or above on all of her core subjects except in mathematics where she scored a 63.

On December 8, 2003, ███s mid-marking period progress report for the second quarter showed that her grades improved slightly across the board, with ███ earning a 70 in mathematics. The child's second quarter grades again showed that she scored 70 or above in all subjects except mathematics where she scored a 68.

Aware of ███'s reading difficulties, Ms. Warner referred her to two school-run programs in an effort to address her reading problems. The parents, however, requested that their daughter be removed from these programs because they believed she should remain in the classroom with Ms. Warner.

---

[7] See Parents' Evidence, Tab 19, page 2.
[8] The privately hired tutor stopped tutoring ███ sometime in December 2003.

According to Mrs. ██████s testimony, in January 2004, at the suggestion of the district, the parents arranged for an independent occupational therapy evaluation of ██████ at Easter Seals in Georgetown, Delaware. Based on its evaluation, Easter Seals recommended direct OT one time per week for twelve weeks with a home carryover program.[9] Mrs. ██████ testified she obtained this Easter Seals evaluation after district officials, specifically Eleanor Gregory, the district's occupational therapy specialist, informed her of this service. The district disputes the allegation that it recommended this additional evaluation. Mrs. ██████ also testified that she provided this evaluation to the district.[10] At the hearing, however, the Easter Seals OT evaluator was unable to give an opinion on whether the objectives set forth by her evaluation had any relationship to the work ██████ performed in school as she never observed the student in school or spoke with Ms. Warner.

At a 504 conference held on February 3, 2004, the parents were notified that ██████ was in danger of failing her third grade year due to her poor math grades. At this meeting, the parents requested further evaluations be performed on their daughter in the areas of achievement and personality. Behavior rating assessments were completed by Ms. Warner and the parents while the district's speech pathologist completed the requested achievement testing.

██████'s third quarter grade report showed that she scored greater than a 70 in all subjects except mathematics where she scored a 67. On March 3, 2004, another 504

---

[9] *See* Parents' Evidence, Tab 30, page 5. Specifically, the Recommendations section of the OT evaluation stated: "██████ would benefit from sensory integration therapy to stimulate processing of kinesthetic and proprioceptive information, as well as to promote development of motor planning skills. Recommended 1x week for 12 weeks with home carryover program. ██████ would benefit from involvement in activities that involve learning novel motor movements, such as dance or karate."
[10] *See* Transcript, March 17, 2005, at pages 97-98. *See also* Parents' Evidence 24 which notes that ██████ was receiving OT once per week at Easter Seals.

6

conference was held to discuss ███s grades and recent testing. At this meeting, it was agreed that ███ would take the upcoming Delaware Student Testing Program ("DSTP") in a small group setting with additional time given with emphasis on re-reading and re-focusing. ███ sat for the DSTP test and did not score well enough to be promoted to the fourth grade.

On March 29, 2004, the parents took ███ to Don D. Blackburn, O.D., for visual testing. Dr. Blackburn testified that he is an optometrist who has specialized in child vision development and vision rehabilitation since 1998. Dr. Blackburn found some problems with the child's eye coordination, convergence and tracking.[11] He testified that he prescribed ███ eyeglasses and 18-24 hours of vision therapy accompanied by home therapy. At the due process hearing, IRSD presented evidence that the parents did not follow through with the recommended vision therapy and they did not fill ███'s eyeglass prescription until September 2004, six months after the evaluation.

By letter dated April 8, 2004, the district informed the parents that ███ would not be promoted to the fourth grade. On April 28, 2004, the parents sent an email to Darlene St. Peter, the district's Special Education Director, acknowledging that their child would repeat the third grade. In that email, the parents requested that ███ be placed in a team room setting[12] for the coming school year and that ███ be given a full psycho-educational assessment. The psycho-educational assessment was completed by mid-May 2004 and the results of this assessment showed that ███ was of average intelligence with average cognitive skills except in the area of visual-spatial

---

[11] *See* Parents' Evidence, Tab 40.
[12] A team room setting consists of a child receiving special education instruction in the morning with a certified special education teacher and, in the afternoon, the child is taught by a regular education teacher for the remainder of the school day.

reasoning with abstract concepts in pattern recognition. She also scored in the average range in word identification.

Notably, ████ scored a grade equivalent level of 1.8 years, representing a severe discrepancy from her ability as indicated on the intelligence and achievement testing. These results caused the school psychologist to organize an Individualized Education Program ("IEP") team meeting to determine if ████ qualified for special education services.

On May 26, 2004, the district informed the parents that a two-week remedial course called "Immersion in Learning" was being offered to students, such as their daughter, who did not satisfy state testing standards in math or reading. On this same date, the parents rejected this offer and stated they did not want their daughter removed from the traditional classroom setting.

An IEP meeting was scheduled for June 11, 2004. The parents completed an IEP input form which listed their daughter's areas of weakness as reading comprehension and math. On this form, the parents also noted that while their daughter was failing, "she has been tremendously supported throughout the school."

The June 11, 2004 IEP meeting was rescheduled to June 14, 2004.[13] At this meeting, the school psychologist opined that ████ had a mild learning disability in reading comprehension. The parents accepted this finding. The IEP team classified ████ as learning disabled in reading comprehension and agreed she would repeat

---

[13] The following individuals attended this IEP meeting: Connie Warner, Jan Drake (IRSD's special education coordinator and special education teacher), Chuck Rechsteiner (the school psychologist who performed the psycho-educational assessment) Janet Hickman (the assistant principal at Lord Baltimore Elementary School), and the parents.

third grade with a certified special education teacher and regular education teacher working as a team. This is also known as a TAM classroom setting.

Jan Drake, a special education teacher and the school's special education coordinator, prepared a proposed IEP plan to be considered at a follow-up IEP meeting that was held on July 9, 2004.[14] The proposed IEP listed ▇▇▇s strengths as "very friendly," "cooperative," "a very conscientious student," and "wants to do well and tries hard to please." The IEP made various accommodations, modifications, supports and services in the areas of "reading comprehension"[15], "math reasoning"[16], "listening comprehension/auditory processing"[17], "focusing/staying on task"[18], "visual processing"[19], "anxiety"[20], "grapho-motor inefficiencies"[21], and "need for movement"[22].

---

[14] This IEP plan can be found at Parents' Evidence, Tab 44.

[15] The following accommodations were offered in the area of reading comprehension: support from resource teacher across the curriculum; direct instruction in reading strategies; use of story webs, graphic organizers, story boards, etc.; extra time to complete assignments and tests; small group instruction and testing as needed; teaching memory strategies; and use of neuro-impress methods.

[16] Regarding the area of math reasoning, the IEP included the following accommodations: direct instruction in problem solving strategies; small group instruction and testing as needed; allow the use of charts, graphs, and manipulatives; extra time to complete assignments and in testing; and reteach when necessary.

[17] The IEP also offered ▇▇▇ the following accommodations in the area of listening comprehension/auditory processing: preferential seating close to instruction; repeat directions as needed; frequent checks for understanding, redirect as needed; simplify/restate/reword directions when needed, encourage ▇▇▇to paraphrase to ensure understanding; allow wait time for ▇▇▇ to formulate an answer; encourage eye contact; use of positive reinforcements to encourage desired behavior; computer software program auditory intervention program; allow use of a study buddy when appropriate; and visual aids corresponding to orally presented material.

[18] The following accommodations were offered in the area of focusing/staying on task: cueing/signaling when off task (secret signal); interact frequently, check for understanding, redirect when necessary; and preferential seating close to instruction.

[19] Regarding the area of visual processing, the IEP included the following accommodations: extra time to complete assignments; and room with a Soundfield system.

[20] The IEP included the following accommodations to address ▇▇▇ anxiety: use of positive reinforcement, praise, and encouragement; provide an agenda/schedules of daily routines; allow ▇▇▇ to hold special item; allow to chew gum/Starburst.

[21] The IEP offered the following accommodations to address ▇▇▇ grapho-motor inefficiencies: grade work on content not neatness; extra time to complete assignments; OT consult.

[22] The "need for movement" accommodations offered by the IEP included: allow for movement within classroom; and pass out books, help in classroom.

The IEP also listed benchmarks and objectives for ███ to work toward during the school year.[23]

The team also discussed conducting another occupational therapy evaluation. At the conclusion of this meeting, mother stated that she wished to discuss the proposed plan with ███ s father before committing to the proposed IEP.

On July 21, 2004, Mrs. ███ met with the school principal and informed her that she and her husband disagreed with the proposed IEP plan. The parents also sent a letter to the district on August 20, 2004, explaining that they were removing their daughter from the school because IRSD failed to provide an appropriate IEP plan. The parents enrolled their daughter in Lighthouse Christian School ("LCS") for the 2004-2005 school year.

On September 1, 2004, the parents filed their complaint for a due process hearing. At the hearing, it was learned that on October 1, 2004, ███'s grades at LCS were 92 in math, 84 in reading, 97 in history, 98 in spelling, 96 in science, 92 in handwriting, 95 in Bible, and 89 in language. However, no evidence was presented by the parents that the LCS program was comparable to the curriculum offered by IRSD. Consequently, the panel could not compare the curriculums of these schools. Evidence

---

[23] The IEP specifically listed the following benchmarks and objectives:

   (1) By the end of the first marking period of SY 04-05, ███ will read an end of the year second grade passage at a rate of 40-60 wpm with 0-5 errors and correctly answer 80-100% of comprehension questions.

   (2) By the end of the second marking period of SY 04-05, ███ will read a beg. of the year third grade passage at a rate of 40-50 wpm with 0-5 errors and correctly answer 80-100% of comprehension questions.

   (3) By the end of the third marking period of SY 04-05, ███ will read a mid year third grade passage at a rate of 50-70 wpm with 0-5 errors and correctly answer 80-100% of comprehension questions.

   (4) By June of 2005, ███ will read an end of the year third grade passage at a rate of 50-70 wpm with 0-5 errors and correctly answer 80-100% of comprehension questions.

was presented that ███ was not receiving any of the services the parents requested from IRSD.

## Individuals with Disabilities in Education Act

The Individuals with Disabilities in Education Act ("IDEA")[24] was enacted to assist states in providing special education service to children who are learning disabled.[25] Under the IDEA, a state receives federal funding if it has policies which ensure that learning disabled children are identified, evaluated, and given a Free Appropriate Public Education.[26] Delaware has established policies set out in various statutes[27] and regulations[28] which comply with IDEA directives and its local school systems receive federal funding under the IDEA.

Purported violations of these statutes and regulations are heard by an administrative panel. Appeals of these panel decisions may be heard in either state court or federal district court. In deciding what relief to fashion, the IDEA vests a reviewing court with significant equitable power. According to both federal and state law, a reviewing court shall grant such relief as the court determines is appropriate based on the preponderance of the evidence.[29] The United States Supreme Court construed the extent of a court's power to review a due process hearing decision in *Bd. of Educ. v. Rowley,*[30] stating:

> Thus the provision that a reviewing court base its decision on the "preponderance of the evidence" is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the

---

[24] 20 U.S.C. §1400 *et. seq.*
[25] *See Bernardsville Bd. of Educ. v. J.H.,* 42 F.3d 149, 151 (3rd Cir. 1994).
[26] 20 U.S.C.A. §1415(a).
[27] *See generally* 14 Del. C. §3101 *et seq.*
[28] These regulations are located at 14 DE Admin. Code §925.
[29] *See* 20 U.S.C.A. §1415(i)(2)(C); 14 Del. C. §3142(b).
[30] *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982).

school authorities which they review. The very importance which Congress has attached to compliance with certain procedures in the preparation of an IEP would be frustrated if a court were permitted simply to set state decisions at nought.[31]

### Standard of Review

In *Fisher v. Board of Educ. of Christina School Dist.*,[32] the Delaware Supreme Court defined the standard of review to be applied by this Court when reviewing decisions made by due process hearing panels. The *Fisher* Court adopted a "modified *de novo*" standard of review and held that a reviewing court must give "due weight" to the panel's decision and must accept the panel's findings as *prima facie* correct.[33] If the reviewing court rejects the panel's factual findings, it must explain how the record compels that result.[34]

In adopting a modified *de novo* standard of review, the Delaware Supreme Court has followed the decisions of several other federal and state courts that have reviewed the decisions of administrative bodies in IDEA cases.[35] Courts have chosen to give due deference to IDEA administrative bodies due to their advantageous position to determine witness credibility, and because the "judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent questions of

---

[31] *Id.*

[32] *Fisher v. Board of Educ. of Christina School Dist.*, 856 A.2d 552 (Del. 2004).

[33] *Id.* at 554.

[34] *Id.*

[35] *Id.* at 557 (citing *M.L., C.D. and S.L. v. Federal Way School Dist.*, 341 F3d 1052, 1061 (9th Cir. 2003); *S.H. v. State-Operated School Dist. of Newark*, 336 F.3d 260, 270 (3rd Cir. 2003); *M.M. ex. rel. D.M. v. School Dist. of Greenville County*, 303 F.3d 523, 530 (4th Cir. 2002).

educational policy.'"[36]   Therefore, the reviewing court "should not substitute '[its] own notions of sound educational policy for those of the school authorities.'"[37]

### The Law of "Child Find"

#### Burden on the District

In determining if a child is entitled to a Free Appropriate Public Education ("FAPE"), school districts are required to timely identify and evaluate children who are suspected of having a qualifying disability.[38]  Neither the federal statutory scheme of the IDEA, state statutes nor federal and state regulations establish a deadline for the school district to identify and evaluate a special needs child.

In *W.B. v. Matula,*[39] the Third Circuit Court of Appeals adopted a reasonable time frame approach.  In light of the absence of any statutory or regulatory guidelines setting a timeframe for a school district to identify and evaluate a child, the Court determined that a special needs child must be identified, evaluated, and offered services within a reasonable time after the school district was put on notice of a child's behavior that likely indicates a disability.[40]

In *Hicks, ex rel. Hicks v. Purchase Line School Dist.,*[41] the federal district court further defined a school district's "child find" duty. In *Hicks,* the court made it clear that the duty to "child find" a student who is in need of special education services falls

---

[36] *New Paltz Central School Dist. v. St. Pierre,* 307 F.Supp.2d 394, 397 (N.D.N.Y. 2004) (quoting *A.S. ex rel S. v. Norwalk Board of Education,* 183 F.Supp.2d 534, 539 (D.Conn. 2002).
[37] *Fisher v. Board of Educ. of Christina School Dist.,* 856 A.2d 552, 554 (Del. 2004) (quoting *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982).
[38] *See* 20 U.S.C.A. §1412(a)(3).
[39] *W.B. v. Matula,* 67 F.3d 484, 501 (3rd Circuit 1995).
[40] *Id.*
[41] *Hicks, ex rel. Hicks v. Purchase Line School Dist.,* 251 F.Supp.2d 1250 (W.D. Pa. 2003).

squarely upon the district—not the parents.[42] The duty to timely identify a disabled child

is, therefore, not discharged merely because the child's parents do not explicitly request

special education services. In so holding, the *Hicks* Court relied on the Third Circuit

case of *M.C. on Behalf of J.C. v. Central Regional School Dist.*[43] In *M.C. on Behalf of*

*J.C*, the Third Circuit stated:

> [A] child's entitlement to special education should not depend upon the
> vigilance of the parents (who may not be sufficiently sophisticated to
> comprehend the problem) nor be abridged because the district's behavior
> did not rise to the level of slothfulness or bad faith. Rather, it is the
> responsibility of the child's teachers, therapists, and administrators-and of
> the multi-disciplinary team that annually evaluates the student's progress-
> to ascertain the child's educational needs, respond to deficiencies, and
> place him or her accordingly.[44]

In deciding whether or not a district has satisfied its "child find" duty, the key

inquiry is whether or not the district had reason to suspect that a child qualifies for

services under the IDEA.[45]    Once the surrounding circumstances create such a

suspicion, the "child find" duty is triggered and the district must evaluate the child in a

timely fashion.[46] If the district has reason to suspect a disability but fails to evaluate and

refer the child within a reasonable time, the child's parents (on the child's behalf) may

"state a claim for services that should have been delivered between the date on which

services would have commenced had the child been identified in a timely manner."[47]

Based on the legal principles above, one is led to the conclusion that "child find"

is an integral, indispensable, and indivisible part in providing a qualified child with a Free

Appropriate Public Education.  Identifying a special needs child is merely a part of the

---

[42] *Id.* at 1253.
[43] *M.C. on Behalf of J.C. v. Central Regional School Dist,* 81 F.3d 389 (3rd Circuit 1996).
[44] *Id.* at 397.
[45] *Dept. of. Educ., State of Hawaii v. Cari Rae S.,* 158 F.Supp.2d 1190, 1194 (D.Haw. 2001).
[46] *Id.*
[47] *Bd. Of Educ. of Fayette Co., v. L.M. ex rel T.D.,* Civ.A. 04-266-JBC, slip op., 2006 WL 566083 at *5 (E.D. Ky. March 6, 2006).

continuum that leads to providing a Free Appropriate Public Education to a disabled child. It is clear that if there is no "child find" there can be no timely IEP and "no IEP; no FAPE under the *Rowley* standard."[48]

## The Panel Dismissed Parent's Child Find Claim as Untimely

The administrative panel – consisting of an educator, a layperson, and an attorney – conducted a five-day hearing which took place on January 20, 2005; January 24, 2005; February 15, 2005; March 15, 2005 and March 17, 2005. The record reflects that the first panel chair withdrew before the start of the hearing. A new chair was appointed in January of 2005 and acted as the panel chair during the duration of the proceedings.[49]

A teleconference was held on December 16, 2005 and in attendance was the first panel chair, the educator on the panel, and the parents. John Werner, the layperson on the panel, and the attorney for the district, James Griffin, Esquire, did not participate in this teleconference as Mr. Griffin apparently did not receive timely notice of the teleconference. In a letter written by the panel chair on December 29, 2004[50] which memorialized the meeting, the parties stipulated that the only issue to be decided was whether the district failed to provide ███████ with a Free Appropriate Public Education. The letter does not indicate for what period of time the parents are alleging ███████ did not receive a Free Appropriate Public Education.

---

[48] See *Dept. of. Educ., State of Hawaii v. Cari Rae S.*, 158 F.Supp.2d 1190, 1196 (D.Haw. 2001).
[49] According to 14 Del. C. §3137(d), the administrative panel must be composed of an attorney admitted to practice in this State, an educator knowledgeable in the field of special education, and a lay person with a demonstrated interest in the education of the handicapped.
[50] See Exhibit Binder labeled "Correspondence," Tab 10.

A second teleconference was held on January 19, 2005 and all parties and panel members, including the new panel chair, participated in this meeting.[51]  According to the panel's chair January 19, 2005 letter which memorialized this teleconference, the parties again agreed that the panel was to decide whether the district provided ███ with a Free Appropriate Public Education through the proposed IEP.[52]  This letter does not state for what period of time parents are alleging ███ did not receive a Free Appropriate Public Education.  The panel chair did state in the letter that the parents also wished to argue that the district failed to employ "child find" for their daughter.  At this teleconference, the district opposed the "child find" claim on the basis that the district was not given timely notice of the issue.  Specifically, the district argued the parents filed their request for a due process hearing on September 1, 2004 and the issue of "child find" did not appear in the complaint.  The district also asserted that the first time it was made aware that the parents were alleging the district failed to employ "child find" for their daughter was in the parents' submission of exhibits which occurred on January 11, 2005.

According to the panel's chair January 19, 2005 letter, the parents first alleged that their failure to raise the "child find" issue in their September 2004 due process request was because they did not receive the AMSES manual[53] until September 2004. The parents also argued that the district was aware the parents intended to argue that

---

[51] According to the panel chair's letter dated January 6, 2005, the purpose of this second teleconference was to narrow the issues, determine which party would present its case first, discuss witness sequestration, and to decide if any facts could be stipulated.

[52] *Id.*

[53] The Administrative Manual for Special Education Services (AMSES manual) was developed by the Delaware Department of Education and addresses the state and federal requirements for the administration and delivery of services and support for children with disabilities under the age of 21.  It is unclear why parents place such significance on the fact that they did not receive the AMSES manual prior to filing their due process complaint.

their daughter was not properly identified as learning disabled since this issue was discussed during meetings in the fall of 2004.[54]

Ultimately, the panel ruled the parents could not present any evidence on the "child find" issue. In its decision of June 29, 2005, the panel recognized that "child find" does apply to all children, including ▮▮▮▮. This holding reversed the panel's decision at the outset of the hearing that the parents could not raise this issue because ▮▮▮▮ was not of preschool age. Accordingly, the panel ruled in its June 29, 2005 decision that the parents' "child find" claim would not be considered based on the panel's finding that the claim was not timely raised.

## The Parents' "Child Find" Claim Was Timely Raised

As stated above, the panel dismissed the parents' "child find" claim as untimely. The district argued at the second teleconference on January 19, 2005 that it did not receive notice that the parents intended to argue that their daughter was not properly identified as learning disabled. The district contended that the September 2004 due process complaint did not specifically set out "child find" as an issue in the "description of the problem"[55] and it did not receive notice of this claim until it received the parents' January 11, 2005 letter which alleged the district "failed to 'child find'" as stipulated in

---

[54] *See* Record of Administrative Proceedings, Tab 10 Correspondence, Letter from Panel Chair, dated January 19, 2005.

[55] *See generally* 20 U.S.C.A. §1415(b)(7)(A) which specifically requires that the parent of a child with a disability to provide notice to the school in the complaint of:

(I) the name of the child, the address of the residence of the child (or available contact information in the case of a homeless child), and the name of the school the child is attending;

(II) in the case of a homeless child or youth (within the meaning of section 11434a(2) of Title 42, available contact information for the child and the name of the school the child is attending;

(III) *a description of the nature of the problem* of the child relating to such proposed initiation or change, including facts relating to such problem; and

(IV) a proposed resolution of the problem to the extent known and available to the party at the time.

IDEA Part B-Regulation...section 300.125." The district again restated this argument at the hearing, at pages 10-11 of the transcript:

> **Mr. Griffin:** The objection, I had, it actually went beyond the Child Find. It went to everything in the January 11 letter, which was submitted with the exhibit book, other than the claims that are inherent in the original claim letter, which would be the items three, five, and six. Child Find was one of the matters. There were other alleged technical violations which we were not given notice of until this was a lack of notice issue that I was raising that on.
>
> **Ms. Ostroski:** That is correct. During the teleconference, which was not under court record, under a transcript, the argument from the district was that they were not given timely notice. When the panel took it under advisement, we decided the issue on two grounds. One, first of all, it was moot, so we didn't even have to visit it. And I didn't state this in the written decision because once something is moot, you don't have to go the next step and make the next decision. But the panel did find that there was nothing indicated in the August pleading which would have put the district on notice that you were asking that the child be found to be eligible for services under this code, and that the only place we knew of it was in the January letter. And therefore, even if the issue wasn't moot, the panel is going to find that it is not timely noticed to the district. So I think during the break, Mr. Werner will look for the cite that you are asking us to provide you with. But it doesn't matter even if she didn't find that cite because we had made the decision as the alternative decision that there was not timely notice to the district for them to prepare for today's hearing.

Without even considering whether the parents raised the issue of "child find" in meetings held in the fall of 2004 or at the first teleconference held in December 2004, I find that the parents gave timely notice to the district of this claim as of September 1, 2004, when they filed their due process complaint.

As stated by the United States Supreme Court in *Schaffer ex rel. Schaffer v. Weast*,[56] Congress "has imposed minimal pleading standards, requiring parties to file complaints setting forth 'a description of the nature of the problem,' § 1415(b)(7)(B)(ii), and 'a proposed resolution of the problem to the extent known and available ⋯ at the

---

[56] *Schaffer ex rel. Schaffer v. Weast*, 126 S.Ct. 528, 532 (2005).

time,' § 1415(b)(7)(B)(iii)."[57] This "minimal pleading standard", set forth in *Schaffer*, was addressed in *Escambia County Bd. of Educ. v. Benton,* by the Southern District Court of Alabama.[58]  In *Escambia* the parents presented evidence during the administrative hearing that the IEPs at issue violated the IDEA because they lacked notations showing dates of mastery of stated benchmarks, were vague, and did not specify measurable goals.[59] The school board argued that it was not given notice that these alleged violations would be at issue during the due process hearing because the parents only noted a lack of behavioral assessments/plans defects in the IEP in their due process complaint.   The *Escambia Court,* relying on the *Schaffer* case, stated:

> Such a "minimal pleading standards" construction of the relevant statutory language is irreconcilable with the Board's demand for exacting, all-inclusive cataloguing of all legal theories and facts that [the parents] intended to invoke at the administrative hearing. The Court cannot concur with the Board that the IDEA obligated [the parents] to plead with specificity every legal theory and fact underlying his claims in advance of the hearing. Thus, the Court readily finds that the notice furnished by [the parents] neither subverted the procedural requirements of the IDEA, nor otherwise impaired the Board's due process rights.[60]

I find that the parents' September 1, 2004 complaint met the minimal pleading standards set forth above and the panel, therefore, erred by prohibiting the parents from raising the "child find" claim during the administrative hearing.

The parents state in paragraph one of their due process complaint that they discussed ████'s learning disabilities in detail with school officials and were assured that the school was well-equipped to meet ████'s needs.  Paragraph two of the complaint states that as of October 2003, during the first 504 meeting where the 504

---

[57] *Id.*
[58] *Escambia County Bd. of Educ. v. Benton*, 406 F.Supp.2d 1248, (S.D.Ala.,2005).
[59] *Id.* at 1259.
[60] *Id.* at 1260.

team reviewed ███'s occupational therapy results, ███'s test score revealed "significant deficits that would clearly interfere with her ability to learn." The parents state in this paragraph that the school's occupational therapist specialist would monitor ███ carefully during the school year but this was never done. The complaint states ███'s official school records, which were supplied to the district upon her transfer to Lord Baltimore Elementary School, reveal ███ had auditory issues and needed a phonetic approach to reading.[61] Paragraph four of the complaint states that the parents obtained private evaluations which showed that ███ had difficulties with fluid handwriting but the school never implemented the recommendations contained within these evaluations until June 2004 with the adoption of an IEP for ███.

Furthermore, the relief requested by the parents includes the type of relief that one may reasonably expect from a "child find" claim. In addition to requesting that IRSD provide ███ with occupational therapy and pay for ███'s third grade tuition at LCS, the parent's complaint also requests that IRSD reimburse them for expenses from prior occupational therapy, private tutoring, and services rendered by Sylvan Learning Center. As the occupational therapy, tutoring, and Sylvan Learning Center expenses were all incurred by the parents prior to ███'s evaluation and subsequent IEP, they are the types of expenses for which a party may be entitled to reimbursement if a school district violates its "child find" obligations.[62]

---

[61] See District's Evidence, Tab 1, Parents' Due Process complaint, paragraph 3.
[62] See Dept. of. Educ., State of Hawaii v. Cari Rae S., 158 F.Supp.2d 1190, 1200 (D.Haw. 2001) (Holding that parents may seek reimbursement for medical costs limited to diagnosing and evaluating student's qualifying disability); Board of Education of Fayette v. L.M., No. Civ.A. 04-266-JBC, slip op., 2006 WL 566083 at *5 (E.D. Ky. March 6, 2006) ("Were the child found eligible and in need of IDEA services, one could state a claim for services that should have been delivered between the date on which services would have been commenced had the child been identified in a timely manner.")

Having found that the alleged facts and requested relief contained in the parents' complaint are consistent with a "child find" claim, I cannot agree with the panel's conclusion that the parents' complaint denied the district ample notice to prepare for a "child find" claim. I am satisfied that the complaint satisfies the "minimal pleading standard," and the district was put on adequate notice of the "child find" claim despite the parents' failure to explicitly cite the "child find" provisions of the IDEA. The district's argument that the parents were properly precluded as they did not specifically state "child find" in "the nature of the problem" section of their complaint, places form over substance and disregards the "minimal pleading standard" set forth in *Schaffer* and *Escambia, supra*. Accordingly, the Court finds that the panel erred by prohibiting the parents from raising the "child find" claim during the administrative hearing.

<u>Pre Hearing Conference</u>

Tangentially, the Court notes that the panel held a second teleconference on January 19, 2005 and the purpose for this 12-day rule conference, as stated by the panel chair in her letter dated January 6, 2005, was "to narrow the issues, determine which party would present its case first, discuss witness sequestration, and to decide if any facts could be stipulated." This teleconference took place one day before the proceeding went to trial. However, according to the *Due Process Hearing Technical Assistance Manual* "Prehearing Procedures," item 4, "the panel chair shall schedule a prehearing conference not later than 12 days prior to the hearing for clarification of the issues, for the disposal of procedural requests or disputes and to regulate and expedite the course of the hearing." Mrs. ▇▇▇ brought this rule to the attention of the panel chair in an effort to argue that the teleconference was not conforming with the above

stated rule and the panel chair responded that "[i]t is my understanding that there was a teleconference on December 16, 2004, and that the teleconference currently scheduled for January 17, 2005, is a second teleconference. Therefore, I see no violation of *Due Process Hearing Technical Assistance Manual* as suggested by Mrs. █████"

The Court takes the opportunity to note that the purpose of the first pre-hearing teleconference—namely to dispose of procedural requests or disputes and to regulate and expedite the course of the hearing—was never achieved as the district did not even appear for this meeting. Because the purpose of the first teleconference did not come to fruition, the panel chair held the second teleconference "to narrow the issues, determine which party would present its case first, discuss witness sequestration, and to decide if any facts could be stipulated" as stated by the panel chair in her January 6, 2005 letter to the parties. While the fact that the panel did not hold a teleconference within the timeframe set forth in the *Due Process Hearing Technical Assistance Manual* amounts to harmless error in this case, due to the remand, the Court advises the panel it is to adhere to the procedures set forth in the *Due Process Hearing Technical Assistance Manual* in future proceedings.

### The Law of Individual Education Plans

An important IDEA directive, which Delaware follows, relates to providing a learning disabled child with an appropriate individualized education program ("IEP"). When a child is in need of special education, a local school district must hold an IDEA case conference between the child's parents and local officials to tailor an IEP that identifies goals and objectives designed to address the child's unique needs.[63] The

---

[63] *Fisher v. Bd. of Educ. of Christiana Sch. Dist.*, 856 A.2d 552, 556 (Del. 2004).

IDEA also requires local school districts to afford parents of children operating under IEPs with procedural safeguards, detailed in 20 U.S.C. §1415(b).[64]

To satisfy the IDEA's substantive guarantee that every child receive a Free Appropriate Public Education, the child's IEP must be reasonably calculated to provide meaningful educational benefit at the time it is proposed.[65]   The seminal case construing the language "Free Appropriate Public Education" is *Bd. of Educ. of Hedrick Hudson Central School Dist. v. Rowley*.[66]  In *Rowley*, the United States Supreme Court stated that a Free Appropriate Public Education is one "specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction."[67]  An "appropriate" education does not mean the absolutely best or "potential-maximizing" education available; rather, the states are obliged to provide "a basic floor of opportunity" through a program "individually designed to provide educational benefit to the handicapped child."[68]  If the district fails to provide this "basic floor of opportunity," the parents of a special needs child may seek reimbursement for money spent to give the child a private school education.[69]

---

[64] Some of the procedural safeguards afforded under the IDEA include an opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child. Parents must also be provided with written notice by a school that wishes to change or refuses to change the identification, evaluation, or educational placement of a child, or the provision of a free appropriate public education to the child and parents are permitted to present a due process complaint with respect to such matters. 20 U.S.C. §1415(b).

[65] *See Coale v. State Dept. of Educ.*, 162 F.Supp.2d 316, 326 (D.Del. 2001) citing *Bd. of Educ. of Hedrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 206-207 (1982). *See also*  20 U.S.C.A. § 1400(d)(1)(A); 14 Del. C. § 3120.

[66] *Bd. of Educ. of Hedrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176, 207 (1982).

[67] *See Fisher v. Bd. of Educ. of Christiana Sch. Dist.*, 856 A.2d 552, 557 (Del. 2004) citing *Bd. of Educ. v. Rowley*, 458 U.S. 176,189 (1982).

[68] *See Fisher v. Bd. of Educ. of Christiana Sch. Dist.*, 856 A.2d 552, 557 (Del. 2004) citing *Bd. of Educ. v. Rowley*, 458 U.S. 176,200-201 (1982).

[69] *School Comm. Of Burlington v. Dept. of Educ. of Mass*, 471 U.S. 359, 369 (1985).

In *School Comm. Of Burlington v. Dept. of Educ. of Mass*, the United States Supreme Court held that the IDEA's grant of equitable authority empowers a court "to order school authorities to reimburse parents for their expenditures on private special education for a child if the court ultimately decides that such placement, rather than a proposed IEP, is proper under the Act."[70] The Third Circuit has reduced the *Burlington* holding into a two-part inquiry, stating a court may award a disabled student the cost of his private placement under the IDEA if: (1) the court determines the student's IEP is inappropriate and (2) the parents demonstrate that the private placement they seek is proper.[71] However, a district is not required to pay for private school tuition solely because a private school offers a disabled student a better education than that offered by the proposed IEP. This concept is perhaps best explained by the Sixth Circuit in *Doe v. Bd. of Educ. of Tullahoma City Schools*:[72]

> The Act requires that the Tullahoma schools provide the educational equivalent of a serviceable Chevrolet to every handicapped student. Appellant, however, demands that the Tullahoma school system provide a Cadillac solely for appellant's use... [W]e hold that the Board is not required to provide a Cadillac, and that the proposed IEP is reasonably calculated to provide educational benefits to appellant, and is therefore in compliance with the requirements of the IDEA.[73]

If, however, an IEP fails to provide this minimum standard, a district may be liable for private school tuition if the private school proves to be a proper placement for the student. To qualify as a proper placement, a private school need not necessarily meet

---

[70] *Id.*
[71] *See Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 248 (3rd Circuit 1999).
[72] *Doe v. Board of Education of Tullahoma Schools*, 9 F.3d 455 (6th Cir. 1993).
[73] *Id.* at 459-460.

state educational standards, but parents are not free to seek any alternative school they choose if the public school education is inadequate.[74]

### Burden of Proof on District to Prove Appropriateness of the IEP

At a due process hearing, the school district carries the burden of proving whether or not a student's IEP is reasonably calculated to provide educational benefit.[75] If an impartial hearing officer/panel determines that the IEP is appropriate, a reviewing court must give due deference to that factual determination.[76]   When reviewing a proposed IEP, an impartial hearing officer should review the IEP at the time of its inception to determine whether or not the IEP was reasonably calculated to provide the disabled student with a FAPE.[77]   The hearing officer should not use hindsight to determine whether the IEP did, in fact, confer an educational benefit on the student.[78] Rather, the key inquiry is whether or not the IEP was *designed* to provide a student with a FAPE.[79]   The investigation into the appropriateness of an IEP is, therefore, not a results-driven inquiry.   Consequently, a parent that rejects a proposed IEP is not precluded from later challenging the merits of an IEP.   The United States Supreme Court spoke on this exact issue in *Burlington v. Dept. of Educ*, stating:

> A final judicial decision on the merits of an IEP will in most instances come a year or more after the school term covered by that IEP has passed. In the meantime, the parents who disagree with the proposed IEP are faced with a choice: go along with the IEP to the detriment of their child if it turns out to be inappropriate or pay for what they consider to be the appropriate placement. If they choose the latter course, which conscientious parents who have adequate means and who are reasonably confident of their

---

[74] See *Mr. I v. Maine School Administrative Dist.* 55, 416 F.Supp.2d 147, 170 (D. Me. 2006).
[75] DEL. CODE ANN. tit 13, § 3140 (1999); *Coale v. State Dept. of Educ. and Brandywine School Dist.*, 162 F.Supp.2d 316, 324 (D. Del. 2001).
[76] *Fisher v. Board of Educ. of Christina School Dist.*, 856 A.2d 552, 554 (Del. 2004).
[77] *Coale v. State Dept. of Educ. and Brandywine School Dist.*, 162 F.Supp.2d 316, 326 (D. Del. 2001).
[78] *Id.*
[79] *Id.*

assessment normally would, it would be an empty victory to have a court tell them several years later that they were right but that these expenditures could not in a proper case be reimbursed by the school officials.[80]

In the instant case, the due process hearing panel stated the following in its June 29, 2005 decision:

> The panel finds that it can <u>not</u> find that the district failed to provide the student with FAPE or that it did not provide the student with an appropriate IEP *because the parents never allowed [the district] to implement an IEP but instead unilaterally withdrew the student from [the district] and placed her in a private school*. (Emphasis added).

The rationale behind the panel's determination directly contravenes the holding in *Burlington*. The panel's finding that the district provided ████ with an appropriate IEP rested solely on the fact that the parents withdrew ████ from the district and placed her at LCS. The panel effectively placed the burden of proof with respect to the inadequacy of the IEP on the parents when, by statute the district must establish that the proposed IEP provided ████ with a Free Appropriate Public Education.[81] The panel forces parents who are dissatisfied with their child's IEP to continue operating under the plan instead of withdrawing their child and finding a more suitable educational placement.

I find that the panel wrongfully focused on the parents' withdrawal of ████ from the district when ruling on whether the district provided ████ with an appropriate IEP as the parents were entitled to remove ████ from the district and place her in another school. To continue the analogy of the *Tullahoma*[82] Court, the panel in the case at bar never determined whether or not the proposed IEP was the educational equivalent of a

---

[80] *Burlington v. Dept. of Educ.*, 471 U.S. 359, 370 (1985).
[81] *See* 14 Del. C. §3140.
[82] *Tullahoma*, 9 F.3d 455.

serviceable Chevrolet.  Even though the panel was free to open the hood, inspect the engine, and kick the tires, it, instead, denied relief solely because the parents refused to take it for a test drive.

In effect, the hearing panel summarily dismissed the parent's claim that the proposed IEP was inappropriate to meet ████s specific needs.  This decision — when combined with the panel's dismissal of the "child-find" claim — reveals a fatal flaw in the administrative proceedings below. According to the rationale of the due process panel, the "child find" claim was invalid because it was not timely pled in the complaint, and the claim of an inappropriate IEP could not be considered because the parents did not allow the district to implement the IEP.  However, these were the only two claims asserted by the parents in this case.  By framing the legal issues as such, the panel essentially held a full hearing where there was no factual dispute relevant to the legal claims asserted by either party.  If the legal analysis of the panel was correct, then the parents' claims were insufficient as pled, and a hearing on the case was unnecessary.  I am satisfied that the legal analysis of the panel created a fundamental flaw in the due process proceeding, and the Court, therefore, remands the issue of whether the district provided ████ with an appropriate IEP.

## Conclusion

Based on the foregoing, the panel's decision is reversed, and this case is remanded to an administrative panel to determine if the IRSD satisfied its "child find" duty under the IDEA and if the IRSD provided ████ with an appropriate IEP.

In deciding to remand this case to a due process panel, the Court recognizes that it has access to the full record of the due process hearing including a transcript of the

testimony and copies of all exhibits. Although the voluminous record provides this Court with some guidance as to whether or not the district met its obligations under the IDEA, I am satisfied that remanding the case is the appropriate course of action. Title 14, chapter 31 of the Delaware Code provides the statutory framework for due process proceedings in special education disputes. The statutory scheme of Chapter 31 illustrates a legislative intent that disputes under the IDEA are to be resolved by a panel that has specialized knowledge in the education of disabled persons. Specifically, title 14, section 3137 sets forth the following:

> (d) Each panel shall consist of 3 panelists, appointed by the Secretary of Education on a rotating basis, as follows:
> (1) One attorney admitted to practice in the State;
> (2) One educator knowledgeable in the field of special education and special education programming;
> (3) One lay person with demonstrated interest in the education of the handicapped included on an approved list compiled by the Advisory Council for Exceptional Citizens and submitted to the Secretary of Education.[83]

The make-up of the due process hearing panel clearly demonstrates that controversies surrounding the education of disabled children are to be decided by an administrative body with specialized knowledge in both education and law. This intent is furthered by the Delaware Supreme Court's adoption of a modified *de novo* standard of review for IDEA panel decisions.[84]

Having already decided that the legal issues in this case were not properly analyzed, I am satisfied that the panel's legal analysis prevented the panel from reaching a decision on whether or not the actions of the IRSD complied with accepted practice within the educational community. Specifically, the panel never used its

---

[83] DEL. CODE ANN., tit. 14, §3137(d) (1999).
[84] *Fisher v. Board of Educ. of Christina School Dist.*, 856 A.2d 552 (Del. 2004).

expertise in education policy to determine whether the IRSD identified ███ in a reasonable time as a student in need of special education services, and it also never decided whether or not the proposed IEP was reasonably calculated to provide ███ with a FAPE. Both of these inquiries are factual issues that remain unresolved due to the application of erroneous legal standards, and both inquiries are best resolved by an administrative panel charged with using its expertise in special education to evaluate the actions of the IRSD.

Had the panel applied the proper legal standard, this Court would be obligated to give those factual conclusions due deference and apply the modified *de novo* standard of review to determine if the evidence in the record supports the panel's conclusions. However, as the record stands now, the Court cannot make a decision on this case without wholly supplanting the administrative panel and placing itself in the position of evaluating educational policy. Such an inquiry by this Court would be contrary to the legislative intent behind creating an administrative panel with expertise in special education and contrary to the rationale behind the modified *de novo* standard of review.

Therefore, the Court remands this case to a due process educational panel in order to resolve the following issues.

(1)    Did the IRSD timely identify ███ as a disabled student and, thus, timely provide her with an IEP?

(2)    Was the IEP for the 2004-2005 school year reasonably calculated to provide ███ with a Free Appropriate Public Education?

(3)    If the IRSD failed to satisfy either obligation, the panel shall decide an appropriate remedy.

The panel's June 29, 2005 decision and order is hereby reversed and the case is remanded for a decision in accordance with this opinion. The administrative panel may hear additional evidence and argument only to the extent that it is necessary to resolve the issues on remand, provided that any additional evidence is consistent with the parties' original pleadings and complies with the applicable law and procedural rules.

**IT IS SO ORDERED** this *19th* day of January, 2007.

Kenneth M. Millman, Judge

KMM/rdc

cc:    Mr. and Mrs. William ████
       James D. Griffin, Esquire
       Ms. Martha Toomey/DOE
       Janell S. Ostroski, Esquire/Panel Chair
       File

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

WILLIAM and MAUREEN ANELLO,    )
                                      )
           Plaintiffs,      )
                                      )
         v.            )     C.A. No. 07-668 LPS
                                      )
INDIAN RIVER SCHOOL DISTRICT   )
and SUSAN S. BUNTING,      )
                                      )
           Defendants.    )

## CERTIFICATE OF ELECTRONIC SERVICE

I, David H. Williams, III hereby certify that on August 26, 2008, I electronically filed the attached **REDACTED EXHIBIT NO. 1 TO DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** with the Clerk of Court using CM/ECF, and that I have mailed by United States Postal Service the document to the following non-registered participants:

> William Anello
> 362 Alba Court
> West Grove, PA 19390
>
> Maureen Anello
> 362 Alba Court
> West Grove, PA 19390
>
> _David H. Williams_
> David H. Williams (#616)
> dwilliams@morrisjames.com
> James H. McMackin, III (#4284)
> jmcmackin@morrisjames.com
> MORRIS JAMES LLP
> 500 Delaware Avenue, Suite 1500
> P.O. Box 2306
> Wilmington, DE 19899
> (302) 888-6900/5849
> Attorneys for Defendants

Dated: August 26, 2008