## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| MAUREEN and WILLIAM ANELLO, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civ. No. 07-668-LPS |
| | : | |
| INDIAN RIVER SCHOOL DISTRICT and | : | |
| SUSAN S. BUNTING, | : | |
| | : | |
| Defendants. | : | |

Maureen and William Anello, *pro se*, for Plaintiffs.

David H. Williams and James H. McMackin, Wilmington, Delaware, Attorneys for Defendants.

## **MEMORANDUM OPINION**

February 6, 2009
Wilmington, Delaware

**STARK, U.S. Magistrate Judge**

## INTRODUCTION

This case centers on whether the needs of a learning-disabled child, G.A., were met by her

former school district. It involves an appeal from a decision of a Special Education Due Process

Hearing Panel (the "Panel") appointed by the Delaware Department of Education. Plaintiffs

Maureen and William Anello, G.A.'s parents (the "parents"), charge Defendants Indian River

School District and Susan S. Bunting (collectively, the "district") with, among other things,[1]

violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq*.

This Court has jurisdiction over the matter pursuant to 28 U.S.C. § 1331.

Presently pending before the Court are cross-motions for summary judgment filed by the

parents and the district. (D.I. 32, 34) The parents seek: (1) a finding that the district failed to

timely identify G.A. as eligible for special education services under the IDEA; (2) a finding that

the individual education program ("IEP") developed, pursuant to the IDEA, by the district for

G.A.'s 2004-2005 school year was not reasonably calculated to provide her with a free appropriate

public education ("FAPE"); (3) an order for compensatory education providing tuition and "all

related costs of an intensive remedial private education . . . continuing until such time as [G.A.'s]

achievement is commensurate with her age-appropriate peers;" (4) reimbursement for private

tuition and related expenses incurred over the 2004-2005 school year at the Lighthouse Christian

School ("LCS"); (5) attorneys' fees; (6) expert witness fees; (7) litigation expenses related to the

---

[1]The Complaint further alleges that (1) the district's actions constitute a violation of 42
U.S.C. § 1983 and (2) the Panel misinterpreted Federal Rules of Evidence 401 and 702,
impeding the parents from presenting evidence in support of their claim to a remedy. (D.I. 1 at
10)

1

administrative hearings held in this matter in 2005 and 2007, in addition to fees incurred in the instant action; and (8) further relief "as the nature of this case and justice require." (D.I. 1 at 10-11) The district's motion requests that the Court affirm the findings of the Panel, arguing that (1) it identified G.A. for special education services in a timely fashion (D.I. 35 at 18-25); (2) while the Panel admittedly "found a short temporal gap" between the date G.A. should have been evaluated for special education services and the date the evaluation was actually completed, the timing issue is moot – because the parents failed to provide verification of their expenses and because the district provided essentially the same services it would have provided had it evaluated G.A. earlier, *id.* at 4 n.6, 25-27; and (3) the IEP was reasonably calculated to provide G.A. with a meaningful educational benefit, *id.* at 27-31.

For the reasons set forth below, both the parents' motion and the district's motion will be granted in part and denied in part.

## BACKGROUND

### A.    Factual Background

The Court has carefully considered the extensive administrative record in this case and given due weight to the Panel's findings.[2] The Court accepts the following findings of fact made by the Panel on remand in 2007:

---

[2]Exhibits contained in the administrative record at D.I. 24 will be cited in the following manner: the administrative hearing case number (05-02 or 07-20, referring to the 2005 and 2007 Panel hearings, respectively), PE/DE (for "Parents' Exhibit" or District's Exhibit," where indicated) - tab number, exhibit number.

2

1.　　　Prior to her enrollment in the [district], the student had attended
　　　　public school in White Plains, New York where she had received
　　　　accommodations under a 504 Plan.[3]

2.　　　On 12/20/02, six months before the child was enrolled in the
　　　　[district], the school district in White Plains, New York, after
　　　　considering a social history, classroom observations, teacher
　　　　reports, a psychological evaluation, a speech/language evaluation,
　　　　an audiological evaluation, an [occupational therapy (hereinafter
　　　　"OT")] evaluation, and a physical examination, determined that the
　　　　student was not eligible for special education services.

3.　　　On 6/13/03, the student was enrolled in third grade at [Lord
　　　　Baltimore Elementary School (hereinafter "LBES")] in the
　　　　[district].

4.　　　In 9/03, the student began attending third grade at LBES and Connie
　　　　Warner was her assigned regular education teacher.

5.　　　On 9/22/03, an initial conference was held to review the NY 504
　　　　Plan and it was determined that the student would remain on a 504
　　　　Plan.  The team established classroom accommodations at this
　　　　conference.  The parents were part of this team and agreed to the
　　　　accommodations.

6.　　　Following the conference, the parents requested and gave
　　　　permission for an OT evaluation.

7.　　　On 9/25/03, Eleanor Gregory performed an OT evaluation and
　　　　concluded that direct OT was not needed but that the [occupational
　　　　therapist] would consult with the teacher if the teacher felt it was
　　　　indicated.  Gregory believed that the 504 Plan adequately addressed
　　　　the weaknesses in visual perception and visual motor skills
　　　　indicated by the OT evaluation she performed.

---

[3]Section 504 of the Rehabilitation Act of 1973, codified at 29 U.S.C. § 794(a), provides
that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by
reason of her or his disability, be excluded from the participation in, be denied the benefits of, or
be subjected to discrimination under any program or activity receiving Federal financial
assistance."  Under Section 504, a disabled school child may receive modifications and
accommodations that are not available to non-disabled children.

8.  Results of the OT evaluation were discussed at a conference on 10/15/03 and it was decided that Gregory would consult with Warner on an as needed basis up to two times per month. The mother was present for said meeting.

9.  The parents argued in the hearing that Gregory was instructed to perform a "sensory awareness" (tactile and vestibular) evaluation and that she did not perform a sensory motor evaluation as requested. There is no evidence to support this position.

10. Warner gave the mother her home phone number and encouraged her to call if there was a problem. She talked to the mother by phone and met with her when the mother asked to meet with her. She testified that they had at least two phone conferences and five meetings.

11. As of 10/2/03, the student's mid-marking period progress report for the first quarter indicated her grades were 65 in Math, 70 in Reading, 76 in English and 74 in Spelling on a scale where 70 or above is a passing score. Her handwriting was marked satisfactory (S).

12. The student's first marking period report card indicated that she scored 70 or above on all of her core subjects except for a 63 in Math.

13. Mother admitted that the curriculum at LBES was harder than the curriculum at the student's school in New York.

14. The services recommended by district officials to improve the student's educational performance during the later half of the first marking period were provided at the parents' expense. The student received instruction from Sylvan Learning Center two times per week and private tutoring by Jessica Norwacki one time per week.

15. On 12/8/03, [the] mid-marking period progress report for the second quarter revealed the student's grades improved slightly and were 80 in Reading, 70 in Math, 76 in English, and 85 in Spelling. However, she received unsatisfactory remarks from her teacher in areas such as Expected Behaviors and Works Independently. This was the same time period when the student was receiving services outside of school as arranged by the parents.

4

16.  The student's grades for the second quarter showed that she scored 70 or above in all subjects except math which was a 68.

17.  Warner had prior experience working with children with auditory processing issues as her own daughter had the same disability and she had also been a regular education team teacher with Jan Drake, a special education teacher at LBES, for 4 years. In that setting, they had worked with children with auditory processing issues.

18.  Warner used a multi-sensory approach in the classroom.

19.  The parents never expressed dissatisfaction with Ms. Warner's teaching efforts nor did they ask her to modify the classroom accommodations.

20.  Warner referred the student to the Host Mentoring Program and to a small group reading program which were both pull out programs done during the school day to address her reading problems. The parents removed the student from these programs without teacher advisement because they believed the student should be in the classroom with Warner.

21.  In January 2004, an independent OT evaluation was performed by J.B. Haughey of Easter Seals, at the expense of the parents, [and] recommended therapy two times per week.

22.  Haughey never contacted the classroom teacher and was unable to give an opinion as to whether the Easter Seals OT objectives had any relationship to the work the student was doing in school because she had never observed her in the school setting.

23.  On 2/3/04, before a 504 meeting, parents received a letter from the district notifying them that the student was in danger of retention because she had not met the criteria for Math.

24.  At the 2/3/04 meeting, the mother requested further evaluations in the areas of achievement and personality. A Conner's Rating Scale was completed by the teacher and parent. A Conner's Rating Scale is a behavior rating scale and not a personality test. There was no evidence presented to prove that an achievement or a personality test was performed as a result of mother's request at this time.

5

25.   The student's 2/25/04 mid-marking period progress report for the third quarter indicated she scored above 70% on all of her core subjects, that her handwriting was satisfactory, and that she was complying with all expected behaviors.

26.   The student's grades for the third quarter showed that she scored greater than 70 in all student's subjects except math where her grade was a 67.

27.   On 3/3/04, a 504 conference was held to discuss the student's grades and recent testing by the [d]istrict's speech pathologist, Paula Howard. It was agreed that she would take the State test in a small group with additional time and emphasis on re-reading and re-focusing. The minutes show the student was using the Earobics program at that date.

28.   On 3/11/04, the student took the State test (DSTP) and scored below the standard required for promotion to fourth grade.

29.   On 4/28/04, the parents sent an e-mail memo to Darlene St. Peter, the [d]istrict's Special Education Director, which acknowledged that the student would be retained in third grade, but asked for a team room setting and a "full educational, psychological, speech and language (please include auditory processing); neurological and physical/occupational assessments."

30.   The 5/4/04 mid-marking period progress report for the fourth quarter showed that the student scored 61 in Reading, 61 in Math, 68 in English and 78 in Spelling, satisfactory in all but one expected behavior, and satisfactory in her ungraded subjects, including handwriting.

31.   On 5/18/04, Charles Rechsteiner performed a psycho-educational assessment. The test revealed that the student is of average intelligence, with average cognitive skills except in the area of visual-spatial reasoning with abstract concepts and pattern recognition. She scored in the average range on word identification. However, in reading comprehension she scored on a grade equivalent (GE) level of 1.8 years representing a severe discrepancy from her ability as indicated on the intelligence and achievement tests. Rechsteiner recommended that an IEP team meet and determine whether the student qualified for special educational services as a child with a learning disability.

6

32. On 5/26/04, the [d]istrict notified the parents that the student did not meet the State standards in Reading and Math and offered her a two week remedial course called "Immersion in Learning" that was tailored to address the Reading and Math deficits indicated on the DSTP.

33. On 5/28/04, the parents notified the [d]istrict that they did not want the student removed from her regular classroom to participate in the Immersion in Learning Program because they wanted her in the classroom with Warner as much as possible.

34. Warner and Rhonda Lynch (school guidance counselor) testified that in late May 2004, the student told them she would be attending [LCS] in September[] 2004.

35. On 6/2/04, an IEP team meeting was scheduled for 6/11/04 to meet and discuss the student's special education needs. On 6/3/04, the parents completed an IEP input form on which they listed the student's areas of weakness as reading comprehension and math. They noted she was failing although "she has been tremendously supported throughout the school."

36. The parents took the student to Dr. Blackburn, OD, for visual testing. He issued a report to the local referring optometrist dated 6/4/04 indicating problems with eye coordination, eye convergence and eye tracking. He prescribed glasses and 18-24 hours of vision therapy in his office with supplemental home therapy. A separate 6/6/04 report to the parents addressed a bottom line deficit in site word decoding and suggested a multi-sensory structured reading program using phonetic principles.

37. The meeting scheduled for 6/11/04 was rescheduled to 6/14/04. At that meeting, Rechsteiner reviewed the results of his assessment and his recommendation that the student had a mild learning disability in reading comprehension based on the guidelines contained in AMSES [i.e., the Delaware Department of Education's *Administrative Manual for Special Education Services*].

38. On 6/14/04, the parents accepted the recommendation of the [d]istrict's psychologist (Rechsteiner) that the student was learning disabled in reading comprehension based on a severe discrepancy between ability and achievement. The [district] team classified the student "Learning Disabled" as a student with a disability in reading

7

comprehension. There was no evidence presented at either hearing indicating that the parents disputed the fact that the student was learning disabled in reading comprehension only and not learning disabled in math as well.

39.     At this point, the team, including the parents, agreed that the student would be retained in third grade in a team room setting with a certified special education teacher. This decision was consistent with Mother's letter of 4/28/04 where she requested a team room setting.

40.     After the 6/14/04 meeting, Drake, who was then the special education coordinator, prepared a proposed IEP. The proposed IEP was considered at the team meeting on 7/9/04.

41.     At the 7/9/04 IEP meeting, the IEP team discussed classroom accommodations which included a soundfield system to address the student's disability in reading comprehension but also discussed accommodations to address math reasoning, listening comprehension and processing, anxiety, graphomotor (handwriting) skills, and a plan for a follow up consult with the OT. The plan included goals and objectives for reading comprehension which was the student's only area of diagnosed learning disability.

42.     The notes from the 7/9/04 meeting indicate that Mother was going to discuss the IEP with father and make a decision on the student's academic career for the 04-05 year . . . .[4]

43.     Twelve days later, on 7/21/04, the mother went to LBES and met with Janet Hickman. She signed the IEP indicating that she did not agree with the proposed plan or the proposed placement.

44.     The parents enrolled the student in LCS on or about 8/3/04 when they paid her annual tuition for the 2004-05 school year.

---

[4]The Panel found that G.A.'s mother "signed the 7/9/04 IEP meeting notes indicating that she agreed with the plan." The parents dispute this finding, claiming that G.A.'s mother signed the meeting notes only to indicate her attendance at the IEP team meeting and not her approval of the proposed IEP. (D.I. 45 at 5) The Court finds the parents' claim consistent with the meeting notes – which indicate that the parents wished to review the proposal further, not that the mother agreed with the plan as written. (D.I. 24, 05-02, DE-8, 29) The question of whether the parents approved of the IEP at any stage, however, is not highly relevant to the evaluation of the plan's appropriateness.

8

45.     On 8/20/04, prior to the start of the 2004-2005 school year, the parents sent Hickman a certified letter informing her that the student would be attending LCS because LBES had failed to provide a concise plan on how to address the student's learning disability and gave four reasons to support their conclusion. . . .[5]

46.     October 1, 2004, the student's grades from the LCS were: Math 92; Reading 84; History 97; Spelling 98; Science 96; Handwriting 92; Bible 95; Language 89. There was no evidence presented that the programs at LCS and LBES were comparable. Therefore, the panel could not compare the student's progress in the two schools.

47.     There was evidence presented that the student was receiving none of the services at LCS that the parents were requesting be provided by LBES. However, she was receiving excellent grades.

48.     There was also evidence presented that the parents did not fill the student's eye glass prescription until September[] 2004, and that she was not wearing the eye glasses at school in LCS.

49.     Parents presented no non-hearsay evidence as to the amount of money they are requesting to be reimbursed for private school placement or related costs for enrollment in an intensive remedial language based program designed to address all of the student's unique needs in a small group setting and continuing until such time as the student's achievement is commensurate with her age appropriate peers.

(D.I. 24, 07-20, 8, Op. at 8-17)

---

[5]The four asserted reasons were: (1) the parents had yet to receive a copy of the Earobics software program to use at home with G.A. and objected to a suggestion "that someone could work with [G.A.] out in the hallway" at school, due to the parents' concerns about auditory stimuli; (2) the OT department had yet to contact parents with a specific plan for addressing G.A.'s somatosensory, praxis, and vestibular issues, and they were concerned that a "help wanted" advertisement on the district's website indicated the district might not have a therapist for the upcoming school year; (3) the parents had not been told who would be working with G.A. "to address her visual issues;" and (4) the parents did not know who G.A.'s teacher for the upcoming school year would be.  (D.I. 24, 05-02, DE-8, 1)

## B.    Procedural History

### The 2005 Administrative Hearing

On August 30, 2004, the parents filed a complaint against the district with the Delaware Department of Education, requesting a due process hearing and seeking reimbursement for past Occupational Therapy ("OT"), private tutoring, services from Sylvan Learning Center, private school tuition, and future OT. (D.I. 24, 05-02, DE-8, 1) The case was heard by the Panel pursuant to 20 U.S.C.A. § 1415(i)(2)(A). On June 28, 2005, the Panel issued a decision in favor of the district on all issues. (D.I. 24, 05-02, 11)

### The Family Court Reverses and Remands with Respect to Two Claims

In September 2005, the parents appealed to the Sussex County Family Court, arguing that the Panel: (1) committed reversible error by prohibiting them from presenting evidence on whether the district failed to timely identify G.A. as a disabled child in need of special education for the 2003-2004 school year, and (2) erred in finding that the district offered G.A. an appropriate IEP for the 2004-2005 school year. (D.I. 33 at 2)

On January 19, 2007, the Family Court affirmed the Panel in part and remanded in part. The Court found that the parents met the minimal pleading standard applicable to complaints arising under the IDEA; that the district was on notice of the parents' claim that the district failed to identify G.A. as eligible for special education (*i.e.*, their "child find" claim); that the Panel committed reversible error in not allowing the parents to present evidence on the "child find" claim; and that the Panel incorrectly focused its decision that the IEP was appropriate on the fact that the parents withdrew G.A. from the district before the IEP could be implemented. *Id.* The Court instructed the panel to decide on remand whether the district failed to timely identify G.A.

10

as a disabled child in need of special education under the IDEA and the Delaware Code, and whether the proposed IEP for the 2004-2005 school year was inappropriate. *Id.* at 2-3. The Court further directed the Panel to consider an appropriate remedy if it determined that the district failed in its duty as to either issue. *Id.* at 3.

### The 2007 Administrative Hearing

On August 1, 2007, following a three-day hearing, the Panel rendered a unanimous decision, partially favorable to the parents. The Panel found that, while it was reasonable to believe that the proposed IEP would have provided G.A. with a meaningful educational benefit had she remained in the district for the 2004-2005 school year, the district – pursuant to Section 3.1 of the Delaware Department of Education's *Administrative Manual for Special Education Services* ("AMSES") – should have evaluated G.A. for special education eligibility within 45 school days of her parents' request for additional testing on February 3, 2004. (D.I. 24, 07-20, 8, Op. at 21) The Panel ordered the district to reimburse the parents for out-of-pocket expenses incurred through their use of Sylvan Learning Center and a private tutor between May 20, 2004 (the date by which, according to the Panel, the "child find" evaluation of G.A. should have been completed) and the end of the school year. *Id.* at 26. The parents were required to provide verification of these expenses within 30 days of the date of decision. *Id.* If the parents failed to provide verification by the Panel's deadline, the district was not obligated to reimburse them. *Id.*

### Proceedings in this Court

On October 24, 2007, the parents filed the instant action. (D.I. 1) Initially, the case was assigned to Chief Judge Gregory M. Sleet and referred to this Magistrate Judge for all pretrial proceedings. The parties subsequently consented to the jurisdiction of the Magistrate Judge and,

11

accordingly, the case was reassigned on November 26, 2007. (D.I. 7) Discovery was completed on June 5, 2008. (D.I. 17) The administrative record was filed with the Court on July 10, 2008. (D.I. 24) Each of the parties moved for summary judgment on August 20, 2008. (D.I. 32, 34) Briefing on the motions was completed on October 15, 2008. (D.I. 45)

## LEGAL STANDARDS

### A. Motions for Summary Judgment

A grant of summary judgment is appropriate only where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 n.10 (1986). "When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). Moreover, "[i]t is true that the issue of material fact required by Rule

12

56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49 (internal quotation marks omitted).

## B. Cases Arising Under the IDEA

The IDEA mandates that a district court reviewing an administrative proceeding "bas[e] its decision on the preponderance of the evidence" and "grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(iii). This "provision that a reviewing court base its decision on the preponderance of the evidence is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Board of Educ. v. Rowley*, 458 U.S. 176, 206 (1982). Rather, "[t]he fact that § 1415(e) requires that the reviewing court receive the records of the [state] administrative proceedings carries with it the implied requirement that due weight shall be given to these proceedings." *Id.* (internal quotation marks omitted) (emphasis added); *see also Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1034 (3d Cir. 1993).

Courts have noted the potential tension between *Rowley's* "due weight" standard and the IDEA "preponderance of the evidence" provision – a provision which would seem to direct the district court to "decide independently whether the requirements of the IDEA are met." *Susan N. v. Wilson School Dist.*, 70 F.3d 751, 757 (3d Cir. 1995). The Third Circuit has not definitively addressed the meaning of "due weight." *Id.* at 758. However, it has stated that district courts must consider administrative findings of fact and further that courts have the "discretion to

13

determine how much deference to accord the administrative proceedings." *Carlisle Area School v. Scott P.*, 62 F.3d 520, 527 (3d Cir. 1995).

Generally, a school district bears the burden of proving that it has satisfied its obligations under the IDEA. *See Carlisle*, 62 F.3d at 533; *Coale v. State Dept. of Educ.*, 162 F.Supp.2d 316, 324 (D. Del. 2001). An exception, however, is that "[t]he burden of proof in an administrative hearing challenging an IEP is properly placed upon the party seeking relief." *Schaffer v. Weast*, 546 U.S. 49, 62 (2005) (emphasis added); s*ee also L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 391 (3d Cir. 2006) (recognizing that after *Schaffer*, burden of proof now falls on party challenging IEP). Thus, the burden of proof as to the parents' "child find" claim is on the district, but the burden as to parents' challenge to the adequacy of the IEP is on the parents.

With respect to a remedy, demonstrating entitlement to reimbursement for private school tuition requires a student or her family to prove that the IEP is inappropriate and that the private placement sought is proper. *See Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 248 (3d Cir. 1999).

## DISCUSSION

### A. The District's "Child Find" Obligation

The IDEA's "child find" provision requires a school district to have a system in place for the identification, location, and evaluation of all disabled children in the district, who "regardless of the severity of their disabilities, . . . are in need of special education and related services." 20 U.S.C. § 1412(a)(3); *see also* 14 Del. C. § 3122. Under the IDEA, a child who has been identified as eligible for special education due to disability is entitled to an individualized education

14

program (IEP), developed by the school district, in order to ensure that she receives a free,

appropriate public education (FAPE). *See Susan N.*, 70 F.3d at 756. Thus, before a child can be

eligible for an IEP, she must first be identified as eligible for special education services as a child

with a disability. *See* 20 U.S.C. § 1414(d)(1)(A).

### *AMSES' identification process*

To assure compliance with the IDEA, the Delaware Department of Education has created

AMSES, incorporating and supplementing the federal IDEA regulations.[6]  AMSES outlines each

school district's responsibility with regard to the identification, evaluation, and support of children

with disabilities, including children with "specific learning disabilit[ies] . . . who, by reason

thereof, need[] special education and related services." AMSES at 25 (citing 34 C.F.R. § 300.7).

Under AMSES, in order for a child to be eligible for special education services for a specific

learning disability, there must be (1) written documentation of the intervention process, including

a summary of those interventions employed to resolve the presenting problems, (2) a

comprehensive psychological assessment performed on the child to rule out other conditions and

evaluate the child's cognitive processes and reasoning, and (3) a "severe discrepancy between

achievement and intellectual ability in one or more [listed] areas" (which include reading

comprehension). *Id.* § 4.8.3.

Under AMSES, a child's road to identification as eligible for special education begins in

one of two ways: either the school's instructional support team[7] ("IST") refers the child for an

---

[6]As of the date of this Opinion, the current version of AMSES is available online at
http://www.doe.state.de.us.

[7]AMSES does not define the term "instructional support team" or provide any
requirements as to the team's makeup, instead requiring each district to adopt its own procedures

15

"initial evaluation to determine eligibility and possible need for special education services" or the

child's parent initiates the referral for initial evaluation by request. *Id.* §§ 2.3 & 2.3.3. While an

IST is required to identify potential learning solutions and instructional strategies before referring

a child for an initial evaluation – and it is plain that the IST's actions may or "may not lead to

referral for [an] initial evaluation" – a parental request "may initiate a referral at any time." *Id.*

§§ 2.3 & 2.3.3. If the IST refers the child for an initial evaluation, the district must obtain parental

consent before the initial evaluation can occur. *Id.* § 3.1. This requirement is mooted where a

parent initiates the referral. *Id.*

The next step is the initial evaluation itself, pursuant to which the child is assessed or

tested by a State-approved evaluation specialist. *Id.* § 3.2.1.1. Thereafter, there must be a

"meeting to determine eligibility" for special education:

> Initial evaluation: Informed written parental consent shall be obtained before
> conducting an initial evaluation, and the meeting to determine eligibility shall
> occur within 45 school days, or 90 calendar days, whichever is shorter, of the
> receipt of consent for the initial evaluation, unless additional time is agreed upon.

---

providing for the referral of children to an IST. AMSES § 2.3.1; *see also id.* § 2.3 ("Referral to
the school's [IST] is a process whereby teachers enlist the help of the team to assist in the
identification of potential instructional strategies or solutions for learning and behavior
problems.").

*Id.* § 3.1.[8] The eligibility determination is made by the school's IEP team. *Id.* § 3.2.4. Eligibility determinations are based on "(1) historical information and (2) evaluation data which are no more than two years old." *Id.* § 3.2.2.

Upon the IEP team's determination that a child is eligible for special education, an IEP must be developed for the eligible child "prior to delivery of services and within thirty (30) calendar days following the determination." *Id.* § 5.0.

### *No "red flags" mandated IST referral prior to February 2004*

As a threshold matter, the Court finds that nothing about G.A. or her academic performance over the 2003-2004 school year mandated a referral for an initial evaluation prior to the mother's request for an initial evaluation on February 3, 2004.[9] Arguing that G.A. should have been referred by the IST even earlier, the parents claim that various "red flags" put the district on notice of the need for an initial evaluation. The parents point out G.A.: was struggling academically throughout the 2003-2004 school year (D.I. 32 at 22); had been on a 504 Plan since

---

[8]The Panel concluded on remand that the district failed to timely identify G.A. as eligible for special education because more than 45 school days elapsed between the mother's initiation of an initial evaluation by her February 3, 2004 request and the May 18, 2004 psycho-educational assessment performed by Dr. Rechsteiner. (D.I. 24, 07-20, 11, Op. at 20-21) The Court reads AMSES § 3.1 to require that no more than 45 school days elapse between the parent's consent to referral and the "meeting to determine eligibility" held by the IEP team to discuss the clinical findings. That is, the "meeting to determine eligibility" was required to be held within 45 school days of February 3, 2004 – i.e., by April 7, 2004 – which necessarily required that the appropriate testing (such as by Dr. Rechsteiner) occur before that date.

[9]The parents argue that their February 3, 2004 request was actually their second request for an initial evaluation. They base this claim on their September 22, 2003 request for an OT evaluation. (D.I. 1 at 4, 5) The Court does not agree. The record shows that on September 22, 2003 G.A.'s mother signed a Request for Permission to Evaluate, which agreed only to an OT evaluation. The boxes relating to all other potential areas of testing – Achievement, Adaptive, Intelligence, Perceptual, Personality, Speech/Language, Physical Therapy, and Assistive Technology – were unchecked. (D.I. 24, 05-02, DE-8, 5)

17

residing in her previous district (D.I. 42 at 14); had "auditory and visual perceptual problems"
which her classroom teacher, Warner, testified had an effect on her reading ability (D.I. 32 at 23-
24 (citing D.I. 24, 05-02, 2, Tr. at 175)); had "sensory integration issues" (D.I. 45 at 3 (citing D.I.
24, 05-02, PE-7, Exs. 1, 3, 4, 6, 8));[10] and had been formally diagnosed with Attention Deficit
Hyperactivity Disorder, *id.*[11]

The parents' argument overlooks the fact that only six months before she enrolled in the
district, G.A.'s previous school district in New York considered information including
psychological, speech/language, audiological, and OT evaluations before determining, on
December 20, 2002, that she was not eligible for special education services. (D.I. 24, 05-02, PE-
7, 11) Additionally, G.A.'s transfer to a new school district and the adjustment period that
followed were factors that might have affected her academic performance and, therefore, were
factors the district court could reasonably have wanted to rule out before referring G.A. for an
initial evaluation. More importantly, G.A.'s grades throughout the first two marking periods were
passing in all graded subjects except Math. (D.I. 24, 05-02, PE-7, 20) By the second marking
period midterm on December 3, 2003, her grades had improved in three subjects and remained
constant in the fourth subject, as she scored an 80 in Reading, 70 in Math, 76 in English, and 85 in

---

[10]A 2002 OT evaluation from G.A.'s prior school district noted that she showed
"inefficient sensory processing in several areas and these have impacted upon both her gross
motor and fine motor skills" including balance, coordination and visual motor skills, and her
"ability to attend and motor plan through tasks. . . . She has the basis for these skills but is at
times unable to filter out unimportant sensory information and continue with the task at hand."
(D.I. 24, 05-02, PE-7, 3)

[11]None of the documents cited by the parents indicate a formal diagnosis of ADHD. On
the contrary, G.A.'s mother stipulated at the 2007 due process hearing that the child had never
been diagnosed with ADHD. (D.I. 24, 07-20, 3, Tr. at 61-63)

Spelling. (D.I. 24, 05-02, PE-7, 22) Although G.A.'s final Math grades for both quarters were failing (D.I. 24, 05-02, DE-8, 11; D.I. 24, 05-02, DE-8, 28), her second marking period grade (68) was an improvement on her first marking period grade (63), and the last data point before the parents' February 3, 2004 request – the December 3, 2003 second marking period midterm evaluation – showed G.A. with a passing grade of 70. Moreover, the psycho-educational assessment ultimately did not show a severe discrepancy between G.A.'s ability and achievement in Math. (D.I. 24, 05-02, DE-8, 36)

Neither did G.A.'s academic struggles occur against a backdrop of institutional indifference. Within the first month of the school year, a conference was held to modify G.A.'s 504 Plan (during which classroom accommodations were established and agreed to by the parents) (D.I. 24, 05-02, DE-8, 5), and an OT evaluation was performed (D.I. 24, 05-02, DE-8, 7). The occupational therapist determined that the 504 Plan properly addressed the visual weaknesses G.A. displayed upon evaluation. (D.I. 24, 05-02, 3, Tr. at 80-94) Further steps were taken by G.A.'s regular classroom teacher, Warner, who had previous experience with auditory processing issues and used a multi-sensory teaching approach in her classroom. (D.I. 24, 05-02, 2, Tr. at 11) Even before G.A.'s mother's February 2004 request for further evaluations, Warner referred G.A. to a small group reading program and the Host Mentoring Program – though the parents chose to remove her from both. (D.I. 24, 05-02, 2, Tr. at 52-53) AMSES provides that interventions of precisely this sort must be attempted and documented before a district refers a child for an initial evaluation. *See* AMSES § 4.8.1 (requiring written documentation, including "a summary of

19

interventions implemented to resolve the presenting problem(s) and the effects of the interventions," to enable an IEP team to determine eligibility for special education).[12]

### *February 3, 2004 referral request triggered "child find" timeline*

G.A.'s mother's February 3, 2004 request that G.A. receive "further evaluations to rule out more things" was, in the totality of circumstances, a parental request for an initial evaluation. (D.I. 24, 07-20, DE-8, 14) While the Panel found that, under AMSES, "the testing should have been done within . . . 45 school days" of the parental request (D.I. 24, 07-20, 11, Op. at 21), § 3.1 of AMSES states that "the meeting to determine eligibility shall occur within 45 school days" of parental consent (unless additional time is agreed upon). AMSES § 3.1 (emphasis added). Here, parental consent was implicit in the parental request which was made on February 3, 2004, and there is no evidence of any agreed-upon extension of the 45-day deadline. Because the "meeting to determine eligibility" requires examination of the test results, AMSES § 3.2.2, the testing must be completed in less than the 45 school days given for the meeting. Therefore, the district had 45 school days from G.A.'s mother's request on February 3, 2004 to meet to determine G.A.'s eligibility for special education – so the eligibility meeting should have taken place by April 7,

---

[12]The parents argue that because the instant case pertains to events that took place between June 2003 and September 2004, the Court should rely on the 1997 version of the IDEA, which did not include a requirement (added to the IDEA, the parents say, in 2004) that a district "rule more things out" before referring a child for an initial evaluation. (D.I. 42 at 14) The parents cite no specific provision in the IDEA, nor any case law in support of their argument. While it is true that the 1997 IDEA required only that a district "obtain an informed consent from the parent" prior to making the referral for testing, *see* PL 105-17, 1997 HR 5 § 614(a)(1)(c), nothing in the 1997 IDEA prohibited a district from implementing (and documenting) interventions prior to making a referral.

2004.[13] Upon the determination that G.A. was eligible for special education, the district would have had an additional 30 calendar days to develop an IEP, and G.A. could have been receiving special education services as early as that date. Accordingly, the district was required to develop an IEP by May 7, 2004. Because it did not do so until July 2004, the district was tardy in complying with its "child find" obligations and the parents are entitled to some relief.

### Purported mootness of the parents' "child find" claim

The district contends that the parents' failure to submit within 30 days of the Panel's decision verification of the out-of-pocket expenses they incurred by using Sylvan Learning Center and a private tutor to assist G.A. during the period she should have been receiving special education – the remedy selected by the Panel – renders their "child find" claim moot. (D.I. 35 at 4 n.3) The Court disagrees. While it is troubling that the parents do not explain why they failed to provide the necessary documentation, it may be that the parents feared that doing so would prejudice their ability to challenge the Panel's determination through judicial action. Recognizing that the parents are proceeding *pro se*, and their filings are not judged in precisely the same way as counsel's, the Court will not find their claim to be moot. *See generally Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1213 (3d Cir. 1984).

The district argues that the "child find" claim is moot also because the services and interventions it provided G.A. prior to her identification as eligible for special education "very much replicated" special education services. (D.I. 35 at 25) These services and interventions included many of the same 504 Plan accommodations as were provided by her previous 504 Plan

---

[13]Although the record does not include the district's 2003-2004 school calendar, neither party challenges the Panel's factual assertion that the 45th school day following February 3, 2004 was April 7, 2004.

21

in White Plains; Warner's multi-sensory teaching approach and use of "small group instruction nearly every day;" the offer of a volunteer to assist G.A. with reading; twice-weekly sessions with a reading teacher in groups of 4-12 students; the Earobics software program; and preferential seating, extra time to complete tasks, and the re-reading of instructions to her. *Id.* at 25-26. This argument more properly goes to the adequacy of the IEP, not the timing of G.A.'s evaluation. The provision of these services and interventions do not relieve the district of its obligation to follow the "child find" procedures set forth in AMSES.

### B. Appropriateness of the Proposed IEP

The IDEA requires the State to "provide special educational services that are reasonably calculated to provide disabled children with meaningful educational benefits. The services to be provided must be tailored to each child's individualized needs, and must be set forth in a written statement referred to as an [IEP]." *Coale,* 162 F.Supp.2d at 319 (internal citations and quotation marks omitted). While there is no bright-line rule for determining how "meaningful" the educational benefit must be, *id.* at 324, the Third Circuit has held that a satisfactory IEP must provide "significant learning," *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 182 (3d Cir. 1988). An IEP "need not be designed to maximize the potential of a disabled student." *Coale*, 162 F.Supp.2d at 324-25. The burden is on the party challenging the IEP to demonstrate its inadequacy. *See Schaffer*, 546 U.S. at 62.

The Panel determined that while the IEP "could have used some modifications to be better," it was reasonably calculated to provide G.A. with a FAPE. (D.I. 24, 07-20, 8, Op. at 24) Giving due weight to the Panel's educational expertise, the Court finds nothing in the record to contradict this conclusion. G.A.'s psycho-educational assessment showed a "severe discrepancy"

22

between her ability and level of functioning only in the area of reading comprehension. (D.I. 24, 05-02, DE-8, 25) Along with the accommodations already in place via G.A.'s existing 504 Plan, the IEP provided her with special education services in reading, led by a certified special education teacher outside the regular classroom, for 12.5 hours per week. *Id*. at 7. There were reading benchmarks given for each marking period. *Id.* at 4. The IEP went beyond reading comprehension to address other areas of concern in which G.A. did not have a qualifying disability (math reasoning, listening comprehension/auditory processing, focusing/staying on task, visual processing, anxiety, grapho-motor inefficiencies, need for movement) and listed services to be provided for those areas as well. (D.I. 24, 05-02, DE-8, 30)

The parents attack the adequacy of the proposed IEP on the grounds that it included "all the accommodations from the failed 504 [P]lan[,] which did not appropriately address all areas of G.A.'s academic weaknesses" (D.I. 32 at 25), but the parents offer no evidence showing that G.A.'s 504 Plan failed. G.A.'s struggles in math certainly do not constitute such a showing, since the IEP was not created to address a qualifying disability in math (as no such disability had been found). (D.I. 24, 05-02, DE-8, 25) Moreover, that the IEP contained significant provisions devoted to addressing G.A.'s non-qualifying areas of concern – including math reasoning and auditory and visual processing – serves to confirm rather than undermine the adequacy of the IEP and the district's efforts to provide G.A. with a meaningful educational benefit (even if those provisions overlapped with provisions of the 504 Plan with which the parents were dissatisfied).[14]

---

[14]Other issues raised by the parents do not merit extended discussion. They claim the Panel violated Federal Rules of Evidence 401 and 702, but the Panel did not make any evidentiary rulings adverse to the parents. The Panel had allowed the parents to submit evidence subject to its authentication by a witness who ultimately did not appear; the Panel then offered the parents an extra day to present evidence, but the parents declined to do so. To the extent the

## C. Remedy

Having found that the district failed to timely identify G.A. as eligible for special education due to her learning disability, the Court agrees with the Panel that the appropriate remedy is for the district to reimburse the parents for out-of-pocket expenses they incurred through use of the Sylvan Learning Center and a private tutor to assist G.A.'s academic performance during the period when she should have been receiving special education services. As explained above, if G.A. had been timely identified she could have been receiving services by May 7, 2004. The district must reimburse the parents for expenses incurred at Sylvan Learning Center and with the private tutor between May 7, 2004 and the end of the 2003-2004 school year.[15]

The parents shall provide documentation (i.e., billing statements, invoices, or canceled checks) verifying the amount of the expenses within 45 days of the date of this Opinion. The district then has 30 days to reimburse the parents. If the parents do not furnish the district with the appropriate documentation by the Court's deadline, the district's obligation to reimburse the parents will cease.

With regard to the parents' request for reimbursement for the January 2004 independent OT evaluation performed by Easter Seals, the Court finds that because Easter Seals' occupational

---

parents assert a claim under 42 U.S.C. § 1983, that statute does not provide a remedy for violations of rights created pursuant to the IDEA. *See A.W. v. Jersey City Public Schools*, 486 F.3d 791, 803, 806 (3d Cir. 2007). Finally, with respect to the parents' attempt to state a claim under Section 504, the record does not establish that the provisions and accommodations in the district's 504 Plan were insufficient under the Rehabilitation Act.

[15]The Panel had ordered the district to pay the parents' expenses only from May 20, 2004 through the end of the 2003-2004 school year. (D.I. 24, 07-20, 8, Op. at 21, 25)

24

therapist did not contact Warner, did not observe G.A. in the school environment, and could not give an opinion as to whether the Easter Seals' objectives corresponded to G.A.'s actual academic programming (D.I. 24, 05-02, 3, Tr. at 291), the district is not required to reimburse the parents for the cost of this evaluation.

Because the parents have failed to prove the inadequacy of the IEP, the record demonstrates that the district was the appropriate placement for G.A. Accordingly, the parents are not entitled to compensatory education in the form of private school tuition or any other related expenses incurred by her transfer to LCS. Finally, the parents' request for attorney's fees and other expenses is denied, as attorney's fees are available only in "exceptional cases." 35 U.S.C. § 285.

## CONCLUSION

For the reasons set forth above, the parents' motion for summary judgment is granted as to their "child find" claim, in that the district did not timely identify G.A. as eligible for special education services. The district shall reimburse the parents for their out-of-pocket expenses incurred between May 3, 2004 and the end of the 2003-2004 school year, subject to the conditions set forth in this Opinion. In all other respects, parents' motion for summary judgment is denied.

The district's motion for summary judgment is granted with respect to the parents' challenge to the adequacy of the IEP and in all other respects is denied.

An appropriate order follows.

25